## ROTH *v.* UNITED STATES.

No. 582.   Argued April 22, 1957.—Decided June 24, 1957.*

---

*Together with No. 61, *Alberts* v. *California*, appeal from the Superior Court of California, Los Angeles County, Appellate Department, argued and decided on the same dates.

478

*David von G. Albrecht* and *O. John Rogge* argued the cause for petitioner in No. 582. With them on the brief were *David P. Siegel, Peter Belsito* and *Murray A. Gordon.*

*Stanley Fleishman* argued the cause for appellant in No. 61. With him on the brief were *Sam Rosenwein* and *William B. Murrish.*

*Roger D. Fisher* argued the cause for the United States in No. 582. With him on the brief were *Solicitor General Rankin* and *Assistant Attorney General Olney.*

*Fred N. Whichello* and *Clarence A. Linn,* Assistant Attorney General of California, argued the cause for appellee in No. 61. With them on the brief were *Edmund G. Brown,* Attorney General, *William B. McKesson* and *Lewis Watnick.*

Briefs of *amici curiae* urging reversal were filed in No. 582 by *Morris L. Ernst, Harriett F. Pilpel* and *Nancy F. Wechsler,* for Ernst, *Irwin Karp* and *Osmond K. Fraenkel,* for the Authors League of America, Inc., *Abe Fortas, William L. McGovern, Abe Krash* and *Maurice Rosenfield,* for the Greenleaf Publishing Co. et al., *Horace S. Manges,* for the American Book Publishers Council, Inc., and *Emanuel Redfield,* for the American Civil Liberties Union.

*A. L. Wirin* filed a brief for the American Civil Liberties Union, Southern California Branch, as *amicus curiae,* in support of appellant in No. 61.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The constitutionality of a criminal obscenity statute is the question in each of these cases. In *Roth,* the primary constitutional question is whether the federal obscenity statute [1] violates the provision of the First Amendment that "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ." In *Alberts,* the primary constitutional question is whether the obscenity provisions of the California Penal Code [2] invade the freedoms of speech and press as they may be incorporated in

---

[1] The federal obscenity statute provided, in pertinent part:

"Every obscene, lewd, lascivious, or filthy book, pamphlet, picture, paper, letter, writing, print, or other publication of an indecent character; and—

.     .     .     .     .

"Every written or printed card, letter, circular, book, pamphlet, advertisement, or notice of any kind giving information, directly or indirectly, where, or how, or from whom, or by what means any of such mentioned matters, articles, or things may be obtained or made, . . . whether sealed or unsealed . . .

.     .     .     .     .

"Is declared to be nonmailable matter and shall not be conveyed in the mails or delivered from any post office or by any letter carrier.

"Whoever knowingly deposits for mailing or delivery, anything declared by this section to be nonmailable, or knowingly takes the same from the mails for the purpose of circulating or disposing thereof, or of aiding in the circulation or disposition thereof, shall be fined not more than $5,000 or imprisoned not more than five years, or both." 18 U. S. C. § 1461.

The 1955 amendment of this statute, 69 Stat. 183, is not applicable to this case.

[2] The California Penal Code provides, in pertinent part:

"Every person who wilfully and lewdly, either:

.     .     .     .     .

"3. Writes, composes, stereotypes, prints, publishes, sells, distributes, keeps for sale, or exhibits any obscene or indecent writing, paper, or book; or designs, copies, draws, engraves, paints, or other-

the liberty protected from state action by the Due Process Clause of the Fourteenth Amendment.

Other constitutional questions are: whether these statutes violate due process,[3] because too vague to support conviction for crime; whether power to punish speech and press offensive to decency and morality is in the States alone, so that the federal obscenity statute violates the Ninth and Tenth Amendments (raised in *Roth*); and whether Congress, by enacting the federal obscenity statute, under the power delegated by Art. I, § 8, cl. 7, to establish post offices and post roads, pre-empted the regulation of the subject matter (raised in *Alberts*).

Roth conducted a business in New York in the publication and sale of books, photographs and magazines. He used circulars and advertising matter to solicit sales. He was convicted by a jury in the District Court for the Southern District of New York upon 4 counts of a 26-count indictment charging him with mailing obscene circulars and advertising, and an obscene book, in violation of the federal obscenity statute. His conviction was affirmed by the Court of Appeals for the Second Circuit.[4] We granted certiorari.[5]

---

wise prepares any obscene or indecent picture or print; or molds, cuts, casts, or otherwise makes any obscene or indecent figure; or,

"4. Writes, composes, or publishes any notice or advertisement of any such writing, paper, book, picture, print or figure; . . .

.        .        .        .        .

"6. . . . is guilty of a misdemeanor. . . ." West's Cal. Penal Code Ann., 1955, § 311.

[3] In *Roth*, reliance is placed on the Due Process Clause of the Fifth Amendment, and in *Alberts*, reliance is placed upon the Due Process Clause of the Fourteenth Amendment.

[4] 237 F. 2d 796.

[5] 352 U. S. 964. Petitioner's application for bail was granted by MR. JUSTICE HARLAN in his capacity as Circuit Justice for the Second Circuit. 1 L. Ed. 2d 34, 77 Sup. Ct. 17.

Alberts conducted a mail-order business from Los Angeles. He was convicted by the Judge of the Municipal Court of the Beverly Hills Judicial District (having waived a jury trial) under a misdemeanor complaint which charged him with lewdly keeping for sale obscene and indecent books, and with writing, composing and publishing an obscene advertisement of them, in violation of the California Penal Code. The conviction was affirmed by the Appellate Department of the Superior Court of the State of California in and for the County of Los Angeles.[6] We noted probable jurisdiction.[7]

The dispositive question is whether obscenity is utterance within the area of protected speech and press.[8] Although this is the first time the question has been squarely presented to this Court, either under the First Amendment or under the Fourteenth Amendment, expressions found in numerous opinions indicate that this Court has always assumed that obscenity is not protected by the freedoms of speech and press. *Ex parte Jackson,* 96 U. S. 727, 736–737; *United States* v. *Chase,* 135 U. S. 255, 261; *Robertson* v. *Baldwin,* 165 U. S. 275, 281; *Public Clearing House* v. *Coyne,* 194 U. S. 497, 508; *Hoke* v. *United States,* 227 U. S. 308, 322; *Near* v. *Minnesota,* 283 U. S. 697, 716; *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 571–572; *Hannegan* v. *Esquire, Inc.,* 327 U. S. 146, 158; *Winters* v. *New York,* 333 U. S. 507, 510; *Beauharnais* v. *Illinois,* 343 U. S. 250, 266.[9]

---

[6] 138 Cal. App. 2d Supp. 909, 292 P. 2d 90. This is the highest state appellate court available to the appellant. Cal. Const., Art. VI, § 5; see *Edwards* v. *California,* 314 U. S. 160.

[7] 352 U. S. 962.

[8] No issue is presented in either case concerning the obscenity of the material involved.

[9] See also the following cases in which convictions under obscenity statutes have been reviewed: *Grimm* v. *United States,* 156 U. S. 604; *Rosen* v. *United States,* 161 U. S. 29; *Swearingen* v. *United States,*

The guaranties of freedom of expression [10] in effect in 10 of the 14 States which by 1792 had ratified the Constitution, gave no absolute protection for every utterance. Thirteen of the 14 States provided for the prosecution of libel,[11] and all of those States made either blasphemy or profanity, or both, statutory crimes.[12] As early as

161 U. S. 446; *Andrews* v. *United States,* 162 U. S. 420; *Price* v. *United States,* 165 U. S. 311; *Dunlop* v. *United States,* 165 U. S. 486; *Bartell* v. *United States,* 227 U. S. 427; *United States* v. *Limehouse,* 285 U. S. 424.

[10] Del. Const., 1792, Art. I, § 5; Ga. Const., 1777, Art. LXI; Md. Const., 1776, Declaration of Rights, § 38; Mass. Const., 1780, Declaration of Rights, Art. XVI; N. H. Const., 1784, Art. I, § XXII; N. C. Const., 1776, Declaration of Rights, Art. XV; Pa. Const., 1776, Declaration of Rights, Art. XII; S. C. Const., 1778, Art. XLIII; Vt. Const., 1777, Declaration of Rights, Art. XIV; Va. Bill of Rights, 1776, § 12.

[11] Act to Secure the Freedom of the Press (1804), 1 Conn. Pub. Stat. Laws 355 (1808); Del. Const., 1792, Art. I, § 5; Ga. Penal Code, Eighth Div., § VIII (1817), Digest of the Laws of Ga. 364 (Prince 1822); Act of 1803, c. 54, II Md. Public General Laws 1096 (Poe 1888); *Commonwealth* v. *Kneeland,* 37 Mass. 206, 232 (1838); Act for the Punishment of Certain Crimes Not Capital (1791), N. H. Laws 1792, 253; Act Respecting Libels (1799), N. J. Rev. Laws 411 (1800); *People* v. *Croswell,* 3 Johns. (N. Y.) 337 (1804); Act of 1803, c. 632, 2 Laws of N. C. 999 (1821); Pa. Const., 1790, Art. IX, § 7; R. I. Code of Laws (1647), Proceedings of the First General Assembly and Code of Laws 44–45 (1647); R. I. Const., 1842, Art. I, § 20; Act of 1804, 1 Laws of Vt. 366 (Tolman 1808); *Commonwealth* v. *Morris,* 1 Brock. & Hol. (Va.) 176 (1811).

[12] Act for the Punishment of Divers Capital and Other Felonies, Acts and Laws of Conn. 66, 67 (1784); Act Against Drunkenness, Blasphemy, §§ 4, 5 (1737), 1 Laws of Del. 173, 174 (1797); Act to Regulate Taverns (1786), Digest of the Laws of Ga. 512, 513 (Prince 1822); Act of 1723, c. 16, § 1, Digest of the Laws of Md. 92 (Herty 1799); General Laws and Liberties of Mass. Bay, c. XVIII, § 3 (1646), Mass. Bay Colony Charters & Laws 58 (1814); Act of 1782, c. 8, Rev. Stat. of Mass. 741, § 15 (1836); Act of 1798, c. 33, §§ 1, 3, Rev. Stat. of Mass. 741, § 16 (1836); Act for the Punishment of Certain Crimes Not Capital (1791), N. H. Laws 1792, 252, 256; Act

1712, Massachusetts made it criminal to publish "any filthy, obscene, or profane song, pamphlet, libel or mock sermon" in imitation or mimicking of religious services. Acts and Laws of the Province of Mass. Bay, c. CV, § 8 (1712), Mass. Bay Colony Charters & Laws 399 (1814). Thus, profanity and obscenity were related offenses.

In light of this history, it is apparent that the unconditional phrasing of the First Amendment was not intended to protect every utterance. This phrasing did not prevent this Court from concluding that libelous utterances are not within the area of constitutionally protected speech. *Beauharnais* v. *Illinois*, 343 U. S. 250, 266. At the time of the adoption of the First Amendment, obscenity law was not as fully developed as libel law, but there is sufficiently contemporaneous evidence to show that obscenity, too, was outside the protection intended for speech and press.[13]

---

for the Punishment of Profane Cursing and Swearing (1791), N. H. Laws 1792, 258; Act for Suppressing Vice and Immorality, §§ VIII, IX (1798), N. J. Rev. Laws 329, 331 (1800); Act for Suppressing Immorality, § IV (1788), 2 Laws of N. Y. 257, 258 (Jones & Varick 1777–1789); *People* v. *Ruggles*, 8 Johns. (N. Y.) 290 (1811); Act . . . for the More Effectual Suppression of Vice and Immorality, § III (1741), 1 N. C. Laws 52 (Martin Rev. 1715–1790); Act to Prevent the Grievous Sins of Cursing and Swearing (1700), II Statutes at Large of Pa. 49 (1700–1712); Act for the Prevention of Vice and Immorality, § II (1794), 3 Laws of Pa. 177, 178 (1791–1802); Act to Reform the Penal Laws, §§ 33, 34 (1798), R. I. Laws 1798, 584, 595; Act for the More Effectual Suppressing of Blasphemy and Prophaneness (1703), Laws of S. C. 4 (Grimké 1790); Act, for the Punishment of Certain Capital, and Other High Crimes and Misdemeanors, § 20 (1797), 1 Laws of Vt. 332, 339 (Tolman 1808); Act, for the Punishment of Certain Inferior Crimes and Misdemeanors, § 20 (1797), 1 Laws of Vt. 352, 361 (Tolman 1808); Act for the Effectual Suppression of Vice, § 1 (1792), Acts of General Assembly of Va. 286 (1794).

[13] Act Concerning Crimes and Punishments, § 69 (1821), Stat. Laws of Conn. 109 (1824); *Knowles* v. *State*, 3 Day (Conn.) 103 (1808);

The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people. This objective was made explicit as early as 1774 in a letter of the Continental Congress to the inhabitants of Quebec:

> "The last right we shall mention, regards the freedom of the press. The importance of this consists, besides the advancement of truth, science, morality, and arts in general, in its diffusion of liberal sentiments on the administration of Government, its ready communication of thoughts between subjects, and its consequential promotion of union among them, whereby oppressive officers are shamed or intimidated, into more honourable and just modes of conducting affairs." 1 Journals of the Continental Congress 108 (1774).

All ideas having even the slightest redeeming social importance—unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion—have the full protection of the guaranties, unless excludable because they encroach upon the limited area of more important interests.[14] But implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance. This rejection for

---

Rev. Stat. of 1835, c. 130, § 10, Rev. Stat. of Mass. 740 (1836); *Commonwealth* v. *Holmes,* 17 Mass. 335 (1821); Rev. Stat. of 1842, c. 113, § 2, Rev. Stat. of N. H. 221 (1843); Act for Suppressing Vice and Immorality, § XII (1798), N. J. Rev. Laws 329, 331 (1800); *Commonwealth* v. *Sharpless,* 2 S. & R. (Pa.) 91 (1815).

[14] *E. g., United States* v. *Harriss,* 347 U. S. 612; *Breard* v. *Alexandria,* 341 U. S. 622; *Teamsters Union* v. *Hanke,* 339 U. S. 470; *Kovacs* v. *Cooper,* 336 U. S. 77; *Prince* v. *Massachusetts,* 321 U. S. 158; *Labor Board* v. *Virginia Elec. & Power Co.,* 314 U. S. 469; *Cox* v. *New Hampshire,* 312 U. S. 569; *Schenck* v. *United States,* 249 U. S. 47.

that reason is mirrored in the universal judgment that obscenity should be restrained, reflected in the international agreement of over 50 nations,[15] in the obscenity laws of all of the 48 States,[16] and in the 20 obscenity laws enacted by the Congress from 1842 to 1956.[17] This is the same judgment expressed by this Court in *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 571–572:

> ". . . There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. *These include the lewd and obscene . . . . It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. . . ."* (Emphasis added.)

We hold that obscenity is not within the area of constitutionally protected speech or press.

It is strenuously urged that these obscenity statutes offend the constitutional guaranties because they punish

---

[15] Agreement for the Suppression of the Circulation of Obscene Publications, 37 Stat. 1511; Treaties in Force 209 (U. S. Dept. State, October 31, 1956).

[16] Hearings before Subcommittee to Investigate Juvenile Delinquency of the Senate Committee on the Judiciary, pursuant to S. Res. 62, 84th Cong., 1st Sess. 49–52 (May 24, 1955).

Although New Mexico has no general obscenity statute, it does have a statute giving to municipalities the power "to prohibit the sale or exhibiting of obscene or immoral publications, prints, pictures, or illustrations." N. M. Stat. Ann., 1953, §§ 14–21–3, 14–21–12.

[17] 5 Stat. 548, 566; 11 Stat. 168; 13 Stat. 504, 507; 17 Stat. 302; 17 Stat. 598; 19 Stat. 90; 25 Stat. 187, 188; 25 Stat. 496; 26 Stat. 567, 614–615; 29 Stat. 512; 33 Stat. 705; 35 Stat. 1129, 1138; 41 Stat. 1060; 46 Stat. 688; 48 Stat. 1091, 1100; 62 Stat. 768; 64 Stat. 194; 64 Stat. 451; 69 Stat. 183; 70 Stat. 699.

incitation to impure sexual *thoughts,* not shown to be
related to any overt antisocial conduct which is or may
be incited in the persons stimulated to such *thoughts.*
In *Roth,* the trial judge instructed the jury: "The words
'obscene, lewd and lascivious' as used in the law, signify
that form of immorality which has relation to sexual
impurity and has a tendency to excite lustful *thoughts."*
(Emphasis added.) In *Alberts,* the trial judge applied
the test laid down in *People* v. *Wepplo,* 78 Cal. App. 2d
Supp. 959, 178 P. 2d 853, namely, whether the material
has "a substantial tendency to deprave or corrupt its
readers by inciting lascivious *thoughts* or arousing lustful
desires." (Emphasis added.) It is insisted that the con-
stitutional guaranties are violated because convictions
may be had without proof either that obscene material
will perceptibly create a clear and present danger of anti-
social conduct,[18] or will probably induce its recipients to
such conduct.[19] But, in light of our holding that obscen-
ity is not protected speech, the complete answer to this
argument is in the holding of this Court in *Beauharnais* v.
*Illinois, supra,* at 266:

> "Libelous utterances not being within the area of
> constitutionally protected speech, it is unnecessary,
> either for us or for the State courts, to consider the
> issues behind the phrase 'clear and present danger.'
> Certainly no one would contend that obscene speech,

----

[18] *Schenck* v. *United States,* 249 U. S. 47. This approach is typi-
fied by the opinion of Judge Bok (written prior to this Court's
opinion in *Dennis* v. *United States,* 341 U. S. 494) in *Commonwealth*
v. *Gordon,* 66 Pa. D. & C. 101, aff'd, *sub nom. Commonwealth* v.
*Feigenbaum,* 166 Pa. Super. 120, 70 A. 2d 389.

[19] *Dennis* v. *United States,* 341 U. S. 494. This approach is typified
by the concurring opinion of Judge Frank in the *Roth* case, 237 F.
2d, at 801. See also Lockhart & McClure, Literature, The Law of
Obscenity, and the Constitution, 38 Minn. L. Rev. 295 (1954).

for example, may be punished only upon a showing of such circumstances. Libel, as we have seen, is in the same class."

However, sex and obscenity are not synonymous. Obscene material is material which deals with sex in a manner appealing to prurient interest.[20] The portrayal of sex, e. g., in art, literature and scientific works,[21] is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press. Sex, a great and mysterious motive force in human life, has indisputably been a subject of absorbing interest to mankind through the ages; it is one of the vital problems of human interest and public concern. As to all such problems,

---

[20] *I. e.,* material having a tendency to excite lustful thoughts. Webster's New International Dictionary (Unabridged, 2d ed., 1949) defines *prurient,* in pertinent part, as follows:

". . . Itching; longing; uneasy with desire or longing; of persons, having itching, morbid, or lascivious longings; of desire, curiosity, or propensity, lewd. . . ."

*Pruriency* is defined, in pertinent part, as follows:

". . . Quality of being prurient; lascivious desire or thought. . . ."

See also *Mutual Film Corp.* v. *Industrial Comm'n,* 236 U. S. 230, 242, where this Court said as to motion pictures: ". . . They take their attraction from the general interest, eager and wholesome it may be, in their subjects, but a *prurient interest may be excited and appealed to.* . . ." (Emphasis added.)

We perceive no significant difference between the meaning of obscenity developed in the case law and the definition of the A. L. I., Model Penal Code, § 207.10 (2) (Tent. Draft No. 6, 1957), *viz.:*

". . . A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, i. e., a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters. . . ." See Comment, *id.,* at 10, and the discussion at page 29 *et seq.*

[21] See, *e. g., United States* v. *Dennett,* 39 F. 2d 564.

488

this Court said in *Thornhill* v. *Alabama,* 310 U. S. 88, 101–102:

"The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully *all matters of public concern* without previous restraint or fear of subsequent punishment. The exigencies of the colonial period and the efforts to secure freedom from oppressive administration developed a broadened conception of these liberties as adequate to supply the public need for *information and education with respect to the significant issues of the times.* . . . Freedom of discussion, if it would fulfill its historic function in this nation, must embrace *all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.*" (Emphasis added.)

The fundamental freedoms of speech and press have contributed greatly to the development and well-being of our free society and are indispensable to its continued growth.[22] Ceaseless vigilance is the watchword to prevent their erosion by Congress or by the States. The door barring federal and state intrusion into this area cannot be left ajar; it must be kept tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests.[23] It is therefore vital that the standards for judging obscenity safeguard the protection of freedom of speech and press for material which does not treat sex in a manner appealing to prurient interest.

The early leading standard of obscenity allowed material to be judged merely by the effect of an isolated

---

[22] Madison's Report on the Virginia Resolutions, 4 Elliot's Debates 571.

[23] See note 14, *supra.*

excerpt upon particularly susceptible persons. *Regina* v. *Hicklin*, [1868] L. R. 3 Q. B. 360.[24] Some American courts adopted this standard[25] but later decisions have rejected it and substituted this test: whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.[26] The *Hicklin* test, judging obscenity by the effect of isolated passages upon the most susceptible persons, might well encompass material legitimately treating with sex, and so it must be rejected as unconstitutionally restrictive of the freedoms of speech and press. On the other hand, the substituted standard provides safeguards adequate to withstand the charge of constitutional infirmity.

Both trial courts below sufficiently followed the proper standard. Both courts used the proper definition of obscenity. In addition, in the *Alberts* case, in ruling on a motion to dismiss, the trial judge indicated that, as the

---

[24] But see the instructions given to the jury by Mr. Justice Stable in *Regina* v. *Martin Secker Warburg*, [1954] 2 All Eng. 683 (C. C. C.).

[25] *United States* v. *Kennerley*, 209 F. 119; *MacFadden* v. *United States*, 165 F. 51; *United States* v. *Bennett*, 24 Fed. Cas. 1093; *United States* v. *Clarke*, 38 F. 500; *Commonwealth* v. *Buckley*, 200 Mass. 346, 86 N. E. 910.

[26] *E. g.*, *Walker* v. *Popenoe*, 80 U. S. App. D. C. 129, 149 F. 2d 511; *Parmelee* v. *United States*, 72 App. D. C. 203, 113 F. 2d 729; *United States* v. *Levine*, 83 F. 2d 156; *United States* v. *Dennett*, 39 F. 2d 564; *Khan* v. *Feist, Inc.*, 70 F. Supp. 450, aff'd, 165 F. 2d 188; *United States* v. *One Book Called "Ulysses,"* 5 F. Supp. 182, aff'd, 72 F. 2d 705; *American Civil Liberties Union* v. *Chicago*, 3 Ill. 2d 334, 121 N. E. 2d 585; *Commonwealth* v. *Isenstadt*, 318 Mass. 543, 62 N. E. 2d 840; *Missouri* v. *Becker*, 364 Mo. 1079, 272 S. W. 2d 283; *Adams Theatre Co.* v. *Keenan*, 12 N. J. 267, 96 A. 2d 519; *Bantam Books, Inc.* v. *Melko*, 25 N. J. Super. 292, 96 A. 2d 47; *Commonwealth* v. *Gordon*, 66 Pa. D. & C. 101, aff'd, *sub nom. Commonwealth* v. *Feigenbaum*, 166 Pa. Super. 120, 70 A. 2d 389; cf. *Roth* v. *Goldman*, 172 F. 2d 788, 794-795 (concurrence).

490

trier of facts, he was judging each item as a whole as it would affect the normal person,[27] and in *Roth,* the trial judge instructed the jury as follows:

". . . The test is not whether it would arouse sexual desires or sexual impure thoughts in those comprising a particular segment of the community, the young, the immature or the highly prudish or would leave another segment, the scientific or highly educated or the so-called worldly-wise and sophisticated indifferent and unmoved. . . .

"The test in each case is the effect of the book, picture or publication considered as a whole, not upon any particular class, but upon all those whom it is likely to reach. In other words, you determine its impact upon the average person in the community. The books, pictures and circulars must be judged as a whole, in their entire context, and you are not to consider detached or separate portions in reaching a conclusion. You judge the circulars, pictures and publications which have been put in evidence by present-day standards of the community. You may ask yourselves does it offend the common conscience of the community by present-day standards.

.      .      .      .      .

"In this case, ladies and gentlemen of the jury, you and you alone are the exclusive judges of what the common conscience of the community is, and in determining that conscience you are to consider the community as a whole, young and old, educated and uneducated, the religious and the irreligious—men, women and children."

---

[27] In *Alberts,* the contention that the trial judge did not read the materials in their entirety is not before us because not fairly comprised within the questions presented. U. S. Sup. Ct. Rules, 15 (1)(c)(1).

It is argued that the statutes do not provide reasonably ascertainable standards of guilt and therefore violate the constitutional requirements of due process. *Winters v. New York,* 333 U. S. 507. The federal obscenity statute makes punishable the mailing of material that is "obscene, lewd, lascivious, or filthy . . . or other publication of an indecent character." [28] The California statute makes punishable, *inter alia,* the keeping for sale or advertising material that is "obscene or indecent." The thrust of the argument is that these words are not sufficiently precise because they do not mean the same thing to all people, all the time, everywhere.

Many decisions have recognized that these terms of obscenity statutes are not precise.[29] This Court, however, has consistently held that lack of precision is not itself offensive to the requirements of due process. ". . . [T]he Constitution does not require impossible standards"; all that is required is that the language "conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. . . ." *United States v. Petrillo,* 332 U. S. 1, 7–8. These words, applied according to the proper standard for judging obscenity, already discussed, give adequate warning of the conduct proscribed and mark ". . . boundaries sufficiently distinct for judges and juries fairly to administer the law . . . . That there may be marginal cases in which it is difficult to determine the side of the line on

[28] This Court, as early as 1896, said of the federal obscenity statute: ". . . Every one who uses the mails of the United States for carrying papers or publications must take notice of what, in this enlightened age, is meant by decency, purity, and chastity in social life, and what must be deemed obscene, lewd, and lascivious." *Rosen v. United States,* 161 U. S. 29, 42.

[29] *E. g., Roth v. Goldman,* 172 F. 2d 788, 789; *Parmelee v. United States,* 72 App. D. C. 203, 204, 113 F. 2d 729, 730; *United States v. 4200 Copies International Journal,* 134 F. Supp. 490, 493; *United States v. One Unbound Volume,* 128 F. Supp. 280, 281.

which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense. . . ." *Id.,* at 7. See also *United States* v. *Harriss,* 347 U. S. 612, 624, n. 15; *Boyce Motor Lines, Inc.* v. *United States,* 342 U. S. 337, 340; *United States* v. *Ragen,* 314 U. S. 513, 523–524; *United States* v. *Wurzbach,* 280 U. S. 396; *Hygrade Provision Co.* v. *Sherman,* 266 U. S. 497; *Fox* v. *Washington,* 236 U. S. 273; *Nash* v. *United States,* 229 U. S. 373.[30]

In summary, then, we hold that these statutes, applied according to the proper standard for judging obscenity, do not offend constitutional safeguards against convictions based upon protected material, or fail to give men in acting adequate notice of what is prohibited.

Roth's argument that the federal obscenity statute unconstitutionally encroaches upon the powers reserved by the Ninth and Tenth Amendments to the States and to the people to punish speech and press where offensive to decency and morality is hinged upon his contention that obscenity is expression not excepted from the sweep of the provision of the First Amendment that *"Congress* shall make *no law* . . . abridging the freedom of speech, or of the press . . . ." (Emphasis added.) That argument falls in light of our holding that obscenity is not expression protected by the First Amendment.[31] We

---

[30] It is argued that because juries may reach different conclusions as to the same material, the statutes must be held to be insufficiently precise to satisfy due process requirements. But, it is common experience that different juries may reach different results under any criminal statute. That is one of the consequences we accept under our jury system. Cf. *Dunlop* v. *United States,* 165 U. S. 486, 499–500.

[31] For the same reason, we reject, in this case, the argument that there is greater latitude for state action under the word "liberty" under the Fourteenth Amendment than is allowed to Congress by the language of the First Amendment.

therefore hold that the federal obscenity statute punishing the use of the mails for obscene material is a proper exercise of the postal power delegated to Congress by Art. I, § 8, cl. 7.[32]   In *United Public Workers* v. *Mitchell,* 330 U. S. 75, 95–96, this Court said:

". . . The powers granted by the Constitution to the Federal Government are subtracted from the totality of sovereignty originally in the states and the people.   Therefore, when objection is made that the exercise of a federal power infringes upon rights reserved by the Ninth and Tenth Amendments, the inquiry must be directed toward the granted power under which the action of the Union was taken.   If granted power is found, necessarily the objection of invasion of those rights, reserved by the Ninth and Tenth Amendments, must fail. . . ."

Alberts argues that because his was a mail-order business, the California statute is repugnant to Art. I, § 8, cl. 7, under which the Congress allegedly pre-empted the regulatory field by enacting the federal obscenity statute punishing the mailing or advertising by mail of obscene material.   The federal statute deals only with actual

[32] In *Public Clearing House* v. *Coyne,* 194 U. S. 497, 506–508, this Court said:

"The constitutional principles underlying the administration of the Post Office Department were discussed in the opinion of the court in *Ex parte Jackson,* 96 U. S. 727, in which we held that the power vested in Congress to establish post offices and post roads embraced the regulation of the entire postal system of the country; that Congress might designate what might be carried in the mails and what excluded . . . .   It may . . . refuse to include in its mails such printed matter or merchandise as may seem objectionable to it upon the ground of public policy . . . .   For more than thirty years not only has the transmission of obscene matter been prohibited, but it has been made a crime, punishable by fine or imprisonment, for a person to deposit such matter in the mails.   The constitutionality of this law we believe has never been attacked. . . ."

mailing; it does not eliminate the power of the state to punish "keeping for sale" or "advertising" obscene material. The state statute in no way imposes a burden or interferes with the federal postal functions. ". . . The decided cases which indicate the limits of state regulatory power in relation to the federal mail service involve situations where state regulation involved a direct, physical interference with federal activities under the postal power or some direct, immediate burden on the performance of the postal functions. . . ." *Railway Mail Assn.* v. *Corsi*, 326 U. S. 88, 96.

The judgments are

*Affirmed.*

MR. CHIEF JUSTICE WARREN, concurring in the result.

I agree with the result reached by the Court in these cases, but, because we are operating in a field of expression and because broad language used here may eventually be applied to the arts and sciences and freedom of communication generally, I would limit our decision to the facts before us and to the validity of the statutes in question as applied.

Appellant Alberts was charged with wilfully, unlawfully and lewdly disseminating obscene matter. Obscenity has been construed by the California courts to mean having a substantial tendency to corrupt by arousing lustful desires. *People* v. *Wepplo*, 78 Cal. App. 2d Supp. 959, 178 P. 2d 853. Petitioner Roth was indicted for unlawfully, wilfully and knowingly mailing obscene material that was calculated to corrupt and debauch the minds and morals of those to whom it was sent. Each was accorded all the protections of a criminal trial. Among other things, they contend that the statutes under which they were convicted violate the constitutional guarantees of freedom of speech, press and communication.

That there is a social problem presented by obscenity is attested by the expression of the legislatures of the forty-eight States as well as the Congress. To recognize the existence of a problem, however, does not require that we sustain any and all measures adopted to meet that problem. The history of the application of laws designed to suppress the obscene demonstrates convincingly that the power of government can be invoked under them against great art or literature, scientific treatises, or works exciting social controversy. Mistakes of the past prove that there is a strong countervailing interest to be considered in the freedoms guaranteed by the First and Fourteenth Amendments.

The line dividing the salacious or pornographic from literature or science is not straight and unwavering. Present laws depend largely upon the effect that the materials may have upon those who receive them. It is manifest that the same object may have a different impact, varying according to the part of the community it reached. But there is more to these cases. It is not the book that is on trial; it is a person. The conduct of the defendant is the central issue, not the obscenity of a book or picture. The nature of the materials is, of course, relevant as an attribute of the defendant's conduct, but the materials are thus placed in context from which they draw color and character. A wholly different result might be reached in a different setting.

The personal element in these cases is seen most strongly in the requirement of *scienter*. Under the California law, the prohibited activity must be done "wilfully and lewdly." The federal statute limits the crime to acts done "knowingly." In his charge to the jury, the district judge stated that the matter must be "calculated" to corrupt or debauch. The defendants in both these cases were engaged in the business of purveying textual or

graphic matter openly advertised to appeal to the erotic interest of their customers. They were plainly engaged in the commercial exploitation of the morbid and shameful craving for materials with prurient effect. I believe that the State and Federal Governments can constitutionally punish such conduct. That is all that these cases present to us, and that is all we need to decide.

I agree with the Court's decision in its rejection of the other contentions raised by these defendants.

MR. JUSTICE HARLAN, concurring in the result in No. 61, and dissenting in No. 582.

I regret not to be able to join the Court's opinion. I cannot do so because I find lurking beneath its disarming generalizations a number of problems which not only leave me with serious misgivings as to the future effect of today's decisions, but which also, in my view, call for different results in these two cases.

## I.

My basic difficulties with the Court's opinion are threefold. First, the opinion paints with such a broad brush that I fear it may result in a loosening of the tight reins which state and federal courts should hold upon the enforcement of obscenity statutes. Second, the Court fails to discriminate between the different factors which, in my opinion, are involved in the constitutional adjudication of state and federal obscenity cases. Third, relevant distinctions between the two obscenity statutes here involved, and the Court's own definition of "obscenity," are ignored.

In final analysis, the problem presented by these cases is how far, and on what terms, the state and federal governments have power to punish individuals for disseminating books considered to be undesirable because of their

nature or supposed deleterious effect upon human conduct. Proceeding from the premise that "no issue is presented in either case, concerning the obscenity of the material involved," the Court finds the "dispositive question" to be "whether obscenity is utterance within the area of protected speech and press," and then holds that "obscenity" is not so protected because it is "utterly without redeeming social importance." This sweeping formula appears to me to beg the very question before us. The Court seems to assume that "obscenity" is a peculiar *genus* of "speech and press," which is as distinct, recognizable, and classifiable as poison ivy is among other plants. On this basis the *constitutional* question before us simply becomes, as the Court says, whether "obscenity," as an abstraction, is protected by the First and Fourteenth Amendments, and the question whether a *particular* book may be suppressed becomes a mere matter of classification, of "fact," to be entrusted to a factfinder and insulated from independent constitutional judgment. But surely the problem cannot be solved in such a generalized fashion. Every communication has an individuality and "value" of its own. The suppression of a particular writing or other tangible form of expression is, therefore, an *individual* matter, and in the nature of things every such suppression raises an individual constitutional problem, in which a reviewing court must determine for *itself* whether the attacked expression is suppressable within constitutional standards. Since those standards do not readily lend themselves to generalized definitions, the constitutional problem in the last analysis becomes one of particularized judgments which appellate courts must make for themselves.

I do not think that reviewing courts can escape this responsibility by saying that the trier of the facts, be it a jury or a judge, has labeled the questioned matter as "obscene," for, if "obscenity" is to be suppressed, the

question whether a particular work is of that character involves not really an issue of fact but a question of constitutional *judgment* of the most sensitive and delicate kind. Many juries might find that Joyce's "Ulysses" or Bocaccio's "Decameron" was obscene, and yet the conviction of a defendant for selling either book would raise, for me, the gravest constitutional problems, for no such verdict could convince me, without more, that these books are "utterly without redeeming social importance." In short, I do not understand how the Court can resolve the constitutional problems now before it without making its own independent judgment upon the character of the material upon which these convictions were based. I am very much afraid that the broad manner in which the Court has decided these cases will tend to obscure the peculiar responsibilities resting on state and federal courts in this field and encourage them to rely on easy labeling and jury verdicts as a substitute for facing up to the tough individual problems of constitutional judgment involved in every obscenity case.

My second reason for dissatisfaction with the Court's opinion is that the broad strides with which the Court has proceeded has led it to brush aside with perfunctory ease the vital constitutional considerations which, in my opinion, differentiate these two cases. It does not seem to matter to the Court that in one case we balance the power of a State in this field against the restrictions of the Fourteenth Amendment, and in the other the power of the Federal Government against the limitations of the First Amendment. I deal with this subject more particularly later.

Thirdly, the Court has not been bothered by the fact that the two cases involve different statutes. In California the book must have a "tendency to deprave or corrupt its readers"; under the federal statute it must tend "to stir sexual impulses and lead to sexually impure

thoughts." [1]   The two statutes do not seem to me to present the same problems.   Yet the Court compounds confusion when it superimposes on these two statutory definitions a third, drawn from the American Law Institute's Model Penal Code, Tentative Draft No. 6: "A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest."   The bland assurance that this definition is the same as the ones with which we deal flies in the face of the authors' express rejection of the "deprave and corrupt" and "sexual thoughts" tests:

> "Obscenity [in the Tentative Draft] is defined in terms of material which appeals predominantly to prurient interest in sexual matters and which goes beyond customary freedom of expression in these matters.   We reject the prevailing test of tendency to arouse lustful thoughts or desires because it is

---

[1] In *Alberts* v. *California,* the state definition of "obscenity" is, of course, binding on us.   The definition there used derives from *People* v. *Wepplo,* 78 Cal. App. 2d Supp. 959, 178 P. 2d 853, the question being whether the material has "a substantive tendency to deprave or corrupt its readers by exciting lascivious thoughts or arousing lustful desire."

In *Roth* v. *United States,* our grant of certiorari was limited to the question of the constitutionality of the statute, and did not encompass the correctness of the definition of "obscenity" adopted by the trial judge as a matter of statutory construction.   We must therefore assume that the trial judge correctly defined that term, and deal with the constitutionality of the statute as construed and applied in this case.

The two definitions do not seem to me synonymous.   Under the federal definition it is enough if the jury finds that the book as a whole leads to certain thoughts.   In California, the further inference must be drawn that such thoughts will have a substantive "tendency to deprave or corrupt"—*i. e.,* that the thoughts induced by the material will affect character and action.   See American Law Institute, Model Penal Code, Tentative Draft No. 6, § 207.10 (2), Comments, p. 10.

unrealistically broad for a society that plainly toler-
ates a great deal of erotic interest in literature, adver-
tising, and art, and because regulation of thought or
desire, unconnected with overt misbehavior, raises
the most acute constitutional as well as practical dif-
ficulties. We likewise reject the common definition
of obscene as that which 'tends to corrupt or debase.'
If this means anything different from tendency to
arouse lustful thought and desire, it suggests that
change of character or actual misbehavior follows
from contact with obscenity. Evidence of such
consequences is lacking . . . . On the other hand,
'appeal to prurient interest' refers to qualities of the
material itself: the capacity to attract individuals
eager for a forbidden look . . . ." [2]

As this passage makes clear, there is a significant dis-
tinction between the definitions used in the prosecutions
before us, and the American Law Institute formula. If,
therefore, the latter is the correct standard, as my Brother
BRENNAN elsewhere intimates,[3] then these convictions
should surely be reversed. Instead, the Court merely
assimilates the various tests into one indiscriminate
potpourri.

I now pass to the consideration of the two cases
before us.

## II.

I concur in the judgment of the Court in No. 61,
*Alberts* v. *California*.

The question in this case is whether the defendant was
deprived of liberty without due process of law when he
was convicted for selling certain materials found by the
judge to be obscene because they would have a "tendency

---

[2] *Ibid.*

[3] See dissenting opinion of MR. JUSTICE BRENNAN in *Kingsley
Books, Inc.* v. *Brown*, No. 107, *ante*, p. 447.

to deprave or corrupt its readers by exciting lascivious thoughts or arousing lustful desire."

In judging the constitutionality of this conviction, we should remember that our function in reviewing state judgments under the Fourteenth Amendment is a narrow one. We do not decide whether the policy of the State is wise, or whether it is based on assumptions scientifically substantiated. We can inquire only whether the state action so subverts the fundamental liberties implicit in the Due Process Clause that it cannot be sustained as a rational exercise of power. See Jackson, J., dissenting in *Beauharnais* v. *Illinois,* 343 U. S. 250, 287. The States' power to make printed words criminal is, of course, confined by the Fourteenth Amendment, but only insofar as such power is inconsistent with our concepts of "ordered liberty." *Palko* v. *Connecticut,* 302 U. S. 319, 324–325.

What, then, is the purpose of this California statute? Clearly the state legislature has made the judgment that printed words *can* "deprave or corrupt" the reader—that words can incite to antisocial or immoral action. The assumption seems to be that the distribution of certain types of literature will induce criminal or immoral sexual conduct. It is well known, of course, that the validity of this assumption is a matter of dispute among critics, sociologists, psychiatrists, and penologists. There is a large school of thought, particularly in the scientific community, which denies any causal connection between the reading of pornography and immorality, crime, or delinquency. Others disagree. Clearly it is not our function to decide this question. That function belongs to the state legislature. Nothing in the Constitution requires California to accept as truth the most advanced and sophisticated psychiatric opinion. It seems to me clear that it is not irrational, in our present state of knowledge, to consider that pornography can induce a type of sexual conduct which a State may deem obnoxious to the

moral fabric of society. In fact the very division of opinion on the subject counsels us to respect the choice made by the State.

Furthermore, even assuming that pornography cannot be deemed ever to cause, in an immediate sense, criminal sexual conduct, other interests within the proper cognizance of the States may be protected by the prohibition placed on such materials. The State can reasonably draw the inference that over a long period of time the indiscriminate dissemination of materials, the essential character of which is to degrade sex, will have an eroding effect on moral standards. And the State has a legitimate interest in protecting the privacy of the home against invasion of unsolicited obscenity.

Above all stands the realization that we deal here with an area where knowledge is small, data are insufficient, and experts are divided. Since the domain of sexual morality is pre-eminently a matter of state concern, this Court should be slow to interfere with state legislation calculated to protect that morality. It seems to me that nothing in the broad and flexible command of the Due Process Clause forbids California to prosecute one who sells books whose dominant tendency might be to "deprave or corrupt" a reader. I agree with the Court, of course, that the books must be judged as a whole and in relation to the normal adult reader.

What has been said, however, does not dispose of the case. It still remains for us to decide whether the state court's determination that this material should be suppressed is consistent with the Fourteenth Amendment; and that, of course, presents a federal question as to which we, and not the state court, have the ultimate responsibility. And so, in the final analysis, I concur in the judgment because, upon an independent perusal of the material involved, and in light of the considerations dis-

cussed above, I cannot say that its suppression would so interfere with the communication of "ideas" in any proper sense of that term that it would offend the Due Process Clause. I therefore agree with the Court that appellant's conviction must be affirmed.

### III.

I dissent in No. 582, *Roth* v. *United States.*

We are faced here with the question whether the federal obscenity statute, as construed and applied in this case, violates the First Amendment to the Constitution. To me, this question is of quite a different order than one where we are dealing with state legislation under the Fourteenth Amendment. I do not think it follows that state and federal powers in this area are the same, and that just because the State may suppress a particular utterance, it is automatically permissible for the Federal Government to do the same. I agree with Mr. Justice Jackson that the historical evidence does not bear out the claim that the Fourteenth Amendment "incorporates" the First in any literal sense. See *Beauharnais* v. *Illinois, supra.* But laying aside any consequences which might flow from that conclusion, cf. Mr. Justice Holmes in *Gitlow* v. *New York,* 268 U. S. 652, 672,[4] I prefer to rest my views about this case on broader and less abstract grounds.

The Constitution differentiates between those areas of human conduct subject to the regulation of the States and those subject to the powers of the Federal Government. The substantive powers of the two governments, in many

---

[4] "The general principle of free speech, it seems to me, must be taken to be included in the Fourteenth Amendment, in view of the scope that has been given to the word 'liberty' as there used, although perhaps it may be accepted with a somewhat larger latitude of interpretation than is allowed to Congress by the sweeping language that governs or ought to govern the laws of the United States."

instances, are distinct. And in every case where we are called upon to balance the interest in free expression against other interests, it seems to me important that we should keep in the forefront the question of whether those other interests are state or federal. Since under our constitutional scheme the two are not necessarily equivalent, the balancing process must needs often produce different results. Whether a particular limitation on speech or press is to be upheld because it subserves a paramount governmental interest must, to a large extent, I think, depend on whether that government has, under the Constitution, a direct substantive interest, that is, the power to act, in the particular area involved.

The Federal Government has, for example, power to restrict seditious speech directed against it, because that Government certainly has the substantive authority to protect itself against revolution. Cf. *Pennsylvania* v. *Nelson*, 350 U. S. 497. But in dealing with obscenity we are faced with the converse situation, for the interests which obscenity statutes purportedly protect are primarily entrusted to the care, not of the Federal Government, but of the States. Congress has no substantive power over sexual morality. Such powers as the Federal Government has in this field are but incidental to its other powers, here the postal power, and are not of the same nature as those possessed by the States, which bear direct responsibility for the protection of the local moral fabric.[5]

---

[5] The hoary dogma of *Ex parte Jackson*, 96 U. S. 727, and *Public Clearing House* v. *Coyne*, 194 U. S. 497, that the use of the mails is a privilege on which the Government may impose such conditions as it chooses, has long since evaporated. See Brandeis, J., dissenting, in *Milwaukee Social Democratic Publishing Co.* v. *Burleson*, 255 U. S. 407, 430–433; Holmes, J., dissenting, in *Leach* v. *Carlile*, 258 U. S. 138, 140; *Cates* v. *Haderline*, 342 U. S. 804, reversing 189 F. 2d 369; *Door* v. *Donaldson*, 90 U. S. App. D. C. 188, 195 F. 2d 764.

What Mr. Justice Jackson said in *Beauharnais, supra,* 343 U. S., at 294–295, about criminal libel is equally true of obscenity:

> "The inappropriateness of a single standard for restricting State and Nation is indicated by the disparity between their functions and duties in relation to those freedoms. Criminality of defamation is predicated upon power either to protect the private right to enjoy integrity of reputation or the public right to tranquillity. Neither of these are objects of federal cognizance except when necessary to the accomplishment of some delegated power . . . . When the Federal Government puts liberty of press in one scale, it has a very limited duty to personal reputation or local tranquillity to weigh against it in the other. But state action affecting speech or press can and should be weighed against and reconciled with these conflicting social interests."

Not only is the federal interest in protecting the Nation against pornography attenuated, but the dangers of federal censorship in this field are far greater than anything the States may do. It has often been said that one of the great strengths of our federal system is that we have, in the forty-eight States, forty-eight experimental social laboratories. "State statutory law reflects predominantly this capacity of a legislature to introduce novel techniques of social control. The federal system has the immense advantage of providing forty-eight separate centers for such experimentation." [6] Different States will have different attitudes toward the same work of literature. The same book which is freely read in one State might be

---

[6] Hart, The Relations Between State and Federal Law, 54 Col. L. Rev. 489, 493.

classed as obscene in another.[7]   And it seems to me that no overwhelming danger to our freedom to experiment and to gratify our tastes in literature is likely to result from the suppression of a borderline book in one of the States, so long as there is no uniform nation-wide suppression of the book, and so long as other States are free to experiment with the same or bolder books.

Quite a different situation is presented, however, where the Federal Government imposes the ban.   The danger is perhaps not great if the people of one State, through their legislature, decide that "Lady Chatterley's Lover" goes so far beyond the acceptable standards of candor that it will be deemed offensive and non-sellable, for the State next door is still free to make its own choice.   At least we do not have one uniform standard.   But the dangers to free thought and expression are truly great if the Federal Government imposes a blanket ban over the Nation on such a book.   The prerogative of the States to differ on their ideas of morality will be destroyed, the ability of States to experiment will be stunted.   The fact that the people of one State cannot read some of the works of D. H. Lawrence seems to me, if not wise or desirable, at least acceptable.   But that no person in the United States should be allowed to do so seems to me to be intolerable, and violative of both the letter and spirit of the First Amendment.

I judge this case, then, in view of what I think is the attenuated federal interest in this field, in view of the very real danger of a deadening uniformity which can result from nation-wide federal censorship, and in view of the

---

[7] To give only a few examples: Edmund Wilson's "Memoirs of Hecate County" was found obscene in New York, see *Doubleday & Co.* v. *New York*, 335 U. S. 848; a bookseller indicted for selling the same book was acquitted in California.   "God's Little Acre" was held to be obscene in Massachusetts, not obscene in New York and Pennsylvania.

fact that the constitutionality of this conviction must be weighed against the First and not the Fourteenth Amendment. So viewed, I do not think that this conviction can be upheld. The petitioner was convicted under a statute which, under the judge's charge,[8] makes it criminal to sell books which "tend to stir sexual impulses and lead to sexually impure thoughts." I cannot agree that any book which tends to stir sexual impulses and lead to sexually impure thoughts necessarily is "utterly without redeeming social importance." Not only did this charge fail to measure up to the standards which I understand the Court to approve, but as far as I can see, much of the great literature of the world could lead to conviction under such a view of the statute. Moreover, in no event do I think that the limited federal interest in this area can extend to mere "thoughts." The Federal Government has no business, whether under the postal or commerce power, to bar the sale of books because they might lead to any kind of "thoughts."[9]

It is no answer to say, as the Court does, that obscenity is not protected speech. The point is that this statute, as here construed, defines obscenity so widely that it encompasses matters which might very well be protected speech. I do not think that the federal statute can be constitutionally construed to reach other than what the Government has termed as "hard-core" pornography. Nor do I think the statute can fairly be read as directed

---

[8] While the correctness of the judge's charge is not before us, the question is necessarily subsumed in the broader question involving the constitutionality of the statute as applied in this case.

[9] See American Law Institute, Model Penal Code, Tentative Draft No. 6, § 207.10, Comments, p. 20: "As an independent goal of penal legislation, repression of sexual thoughts and desires is hard to support. Thoughts and desires not manifested in overt antisocial behavior are generally regarded as the exclusive concern of the individual and his spiritual advisors."

only at *persons* who are engaged in the business of catering to the prurient minded, even though their wares fall short of hard-core pornography. Such a statute would raise constitutional questions of a different order. That being so, and since in my opinion the material here involved cannot be said to be hard-core pornography, I would reverse this case with instructions to dismiss the indictment.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

When we sustain these convictions, we make the legality of a publication turn on the purity of thought which a book or tract instills in the mind of the reader. I do not think we can approve that standard and be faithful to the command of the First Amendment, which by its terms is a restraint on Congress and which by the Fourteenth is a restraint on the States.

In the *Roth* case the trial judge charged the jury that the statutory words "obscene, lewd and lascivious" describe "that form of immorality which has relation to sexual impurity and has a tendency to excite lustful thoughts." He stated that the term "filthy" in the statute pertains "to that sort of treatment of sexual matters in such a vulgar and indecent way, so that it tends to arouse a feeling of disgust and revulsion." He went on to say that the material "must be calculated to corrupt and debauch the minds and morals" of "the average person in the community," not those of any particular class. "You judge the circulars, pictures and publications which have been put in evidence by present-day standards of the community. You may ask yourselves does it offend the common conscience of the community by present-day standards."

The trial judge who, sitting without a jury, heard the *Alberts* case and the appellate court that sustained the

judgment of conviction, took California's definition of "obscenity" from *People* v. *Wepplo,* 78 Cal. App. 2d Supp. 959, 961, 178 P. 2d 853, 855. That case held that a book is obscene "if it has a substantial tendency to deprave or corrupt its readers by inciting lascivious thoughts or arousing lustful desire."

By these standards punishment is inflicted for thoughts provoked, not for overt acts nor antisocial conduct. This test cannot be squared with our decisions under the First Amendment. Even the ill-starred *Dennis* case conceded that speech to be punishable must have some relation to action which could be penalized by government. *Dennis* v. *United States,* 341 U. S. 494, 502–511. Cf. Chafee, The Blessings of Liberty (1956), p. 69. This issue cannot be avoided by saying that obscenity is not protected by the First Amendment. The question remains, what is the constitutional test of obscenity?

The tests by which these convictions were obtained require only the arousing of sexual thoughts. Yet the arousing of sexual thoughts and desires happens every day in normal life in dozens of ways. Nearly 30 years ago a questionnaire sent to college and normal school women graduates asked what things were most stimulating sexually. Of 409 replies, 9 said "music"; 18 said "pictures"; 29 said "dancing"; 40 said "drama"; 95 said "books"; and 218 said "man." Alpert, Judicial Censorship of Obscene Literature, 52 Harv. L. Rev. 40, 73.

The test of obscenity the Court endorses today gives the censor free range over a vast domain. To allow the State to step in and punish mere speech or publication that the judge or the jury thinks has an *undesirable* impact on thoughts but that is not shown to be a part of unlawful action is drastically to curtail the First Amendment. As recently stated by two of our outstanding authorities on obscenity, "The danger of influencing a change in the current moral standards of the community, or of shocking

or offending readers, or of stimulating sex thoughts or desires apart from objective conduct, can never justify the losses to society that result from interference with literary freedom." Lockhart & McClure, Literature, The Law of Obscenity, and the Constitution, 38 Minn. L. Rev. 295, 387.

If we were certain that impurity of sexual thoughts impelled to action, we would be on less dangerous ground in punishing the distributors of this sex literature. But it is by no means clear that obscene literature, as so defined, is a significant factor in influencing substantial deviations from the community standards.

> "There are a number of reasons for real and sub-stantial doubts as to the soundness of that hypoth-esis. (1) Scientific studies of juvenile delinquency demonstrate that those who get into trouble, and are the greatest concern of the advocates of censor-ship, are far less inclined to read than those who do not become delinquent. The delinquents are gen-erally the adventurous type, who have little use for reading and other non-active entertainment. Thus, even assuming that reading sometimes has an adverse effect upon moral conduct, the effect is not likely to be substantial, for those who are susceptible seldom read. (2) Sheldon and Eleanor Glueck, who are among the country's leading authorities on the treat-ment and causes of juvenile delinquency, have recently published the results of a ten year study of its causes. They exhaustively studied approxi-mately 90 factors and influences that might lead to or explain juvenile delinquency, but the Gluecks gave no consideration to the type of reading material, if any, read by the delinquents. This is, of course, consistent with their finding that delinquents read very little. When those who know so much about the problem of delinquency among youth—the very

group about whom the advocates of censorship are most concerned—conclude that what delinquents read has so little effect upon their conduct that it is not worth investigating in an exhaustive study of causes, there is good reason for serious doubt concerning the basic hypothesis on which obscenity censorship is defended. (3) The many other influences in society that stimulate sexual desire are so much more frequent in their influence, and so much more potent in their effect, that the influence of reading is likely, at most, to be relatively insignificant in the composite of forces that lead an individual into conduct deviating from the community sex standards. The Kinsey studies show the minor degree to which literature serves as a potent sexual stimulant. And the studies demonstrating that sex knowledge seldom results from reading indicates [*sic*] the relative unimportance of literature in sex thoughts as compared with other factors in society." Lockhart & McClure, *op. cit. supra,* pp. 385–386.

The absence of dependable information on the effect of obscene literature on human conduct should make us wary. It should put us on the side of protecting society's interest in literature, except and unless it can be said that the particular publication has an impact on action that the government can control.

As noted, the trial judge in the *Roth* case charged the jury in the alternative that the federal obscenity statute outlaws literature dealing with sex which offends "the common conscience of the community." That standard is, in my view, more inimical still to freedom of expression.

The standard of what offends "the common conscience of the community" conflicts, in my judgment, with the command of the First Amendment that "Congress shall make no law . . . abridging the freedom of speech, or

of the press." Certainly that standard would not be an acceptable one if religion, economics, politics or philosophy were involved. How does it become a constitutional standard when literature treating with sex is concerned?

Any test that turns on what is offensive to the community's standards is too loose, too capricious, too destructive of freedom of expression to be squared with the First Amendment. Under that test, juries can censor, suppress, and punish what they don't like, provided the matter relates to "sexual impurity" or has a tendency "to excite lustful thoughts." This is community censorship in one of its worst forms. It creates a regime where in the battle between the literati and the Philistines, the Philistines are certain to win. If experience in this field teaches anything, it is that "censorship of obscenity has almost always been both irrational and indiscriminate." Lockhart & McClure, *op. cit. supra,* at 371. The test adopted here accentuates that trend.

I assume there is nothing in the Constitution which forbids Congress from using its power over the mails to proscribe *conduct* on the grounds of good morals. No one would suggest that the First Amendment permits nudity in public places, adultery, and other phases of sexual misconduct.

I can understand (and at times even sympathize) with programs of civic groups and church groups to protect and defend the existing moral standards of the community. I can understand the motives of the Anthony Comstocks who would impose Victorian standards on the community. When speech alone is involved, I do not think that government, consistently with the First Amendment, can become the sponsor of any of these movements. I do not think that government, consistently with the First Amendment, can throw its weight behind one school or another. Government should be

concerned with antisocial conduct, not with utterances. Thus, if the First Amendment guarantee of freedom of speech and press is to mean anything in this field, it must allow protests even against the moral code that the standard of the day sets for the community. In other words, literature should not be suppressed merely because it offends the moral code of the censor.

The legality of a publication in this country should never be allowed to turn either on the purity of thought which it instills in the mind of the reader or on the degree to which it offends the community conscience. By either test the role of the censor is exalted, and society's values in literary freedom are sacrificed.

The Court today suggests a third standard. It defines obscene material as that "which deals with sex in a manner appealing to prurient interest." * Like the standards applied by the trial judges below, that standard does not require any nexus between the literature which is prohibited and action which the legislature can regulate or prohibit. Under the First Amendment, that standard is no more valid than those which the courts below adopted.

I do not think that the problem can be resolved by the Court's statement that "obscenity is not expression pro-

---

*The definition of obscenity which the Court adopts seems in substance to be that adopted by those who drafted the A. L. I., Model Penal Code. § 207.10 (2) (Tentative Draft No. 6, 1957).

"Obscenity is defined in terms of material which appeals predominantly to prurient interest in sexual matters and which goes beyond customary freedom of expression in these matters. We reject the prevailing tests of tendency to arouse lustful thoughts or desires because it is unrealistically broad for a society that plainly tolerates a great deal of erotic interest in literature, advertising, and art, and because regulation of thought or desire, unconnected with overt misbehavior, raises the most acute constitutional as well as practical difficulties." *Id.*, at 10.

tected by the First Amendment." With the exception of *Beauharnais* v. *Illinois*, 343 U. S. 250, none of our cases has resolved problems of free speech and free press by placing any form of expression beyond the pale of the absolute prohibition of the First Amendment. Unlike the law of libel, wrongfully relied on in *Beauharnais*, there is no special historical evidence that literature dealing with sex was intended to be treated in a special manner by those who drafted the First Amendment. In fact, the first reported court decision in this country involving obscene literature was in 1821. Lockhart & McClure, *op. cit. supra*, at 324, n. 200. I reject too the implication that problems of freedom of speech and of the press are to be resolved by weighing against the values of free expression, the judgment of the Court that a particular form of that expression has "no redeeming social importance." The First Amendment, its prohibition in terms absolute, was designed to preclude courts as well as legislatures from weighing the values of speech against silence. The First Amendment puts free speech in the preferred position.

Freedom of expression can be suppressed if, and to the extent that, it is so closely brigaded with illegal action as to be an inseparable part of it. *Giboney* v. *Empire Storage Co.*, 336 U. S. 490, 498; *Labor Board* v. *Virginia Power Co.*, 314 U. S. 469, 477–478. As a people, we cannot afford to relax that standard. For the test that suppresses a cheap tract today can suppress a literary gem tomorrow. All it need do is to incite a lascivious thought or arouse a lustful desire. The list of books that judges or juries can place in that category is endless.

I would give the broad sweep of the First Amendment full support. I have the same confidence in the ability of our people to reject noxious literature as I have in their capacity to sort out the true from the false in theology, economics, politics, or any other field.