**EASTMAN KODAK COMPANY, a corporation, Appellant,**

v.

**John C. HENDRICKS, Appellee.**

**No. 15476.**

United States Court of Appeals
Ninth Circuit.

Dec. 2, 1958.

McCutchen, Black, Harnagel & Greene, Philip K. Verleger, Jack T. Swafford, George Harnagel, Jr., Los Angeles, Cal., for appellant.

Jerome Weber, Reuben Rosensweig, Jack Altman, Los Angeles, Cal., for appellee.

Before ORR, CHAMBERS and BARNES, Circuit Judges.

CHAMBERS, Circuit Judge.

Eastman Kodak Company has developed 1,000 feet (10 reels) of color film which it originally sold to Hendricks, the sale price including the developing service. Eastman refuses to return the film to Hendricks, although he owns it. The reason given for the refusal is that Eastman believes that which is depicted on the film after developing is obscene; that to return the film would put it in the unhappy situation of having violated the obscenity statutes of California and the City of Los Angeles.

Hendricks does not question Eastman's good faith in the matter, just its judgment. A complaint seeking recovery of the film and damages for retention was filed in the United States District Court for the Southern District of California. Diversity of citizenship plus requisite value was the basis of jurisdiction there. Damages went out of the case below, but the district court after a jury trial with special interrogatories entered judgment for the plaintiff. Eastman, dissatisfied, appeals.

As a preface for a discussion of the jury verdict, the judge's decision and the applicable law, some description of the films should be given. Each roll of film involves a wriggling young woman doing a solo "strip tease" dance. It would appear that three women take their turns in portraying various types of burlesque dances. One is a tall blonde with extremely large bust, approaching bovinity. A second is a tall, slender brunette with medium bust, and the third is a very slender brunette with small bust.

There is no testimony that the films were produced for men's smokers and one cannot say that such was the purpose. However, one would not have to be too worldly, in looking for a short description of the films, to come up with the description: "Cheap movies made for men's smokers," with the connotations such description would bear. Each reel with its dancer has some poor background music. A few pieces of mean scenery are shifted from here to there from film to film, sufficing to portray most any period, most any place.

As the music proceeds with its monotonous grind, the star of the act comes on and writhes and wriggles as she sometimes awkwardly, sometimes deftly peels off clothing item by item. Complete nudity is never achieved. Usually the shoes are retained, but the clothing left would amount to no more in size than two fifty cent pieces for the upper anterior part of the torso and a fig leaf, junior size. The dancing, about as lacking in merit as the scenery, does not achieve what might be called in the trade, "hard bumps and grinds;" just soft ones. The blonde perverting her breasts from the use for which they were intended and throwing them into, first, clockwise and then, counterclockwise motion puts on a show most apt to be remembered. Further, as an attempt to state the facts, it seems fair to say that when the films are exhibited in sequence, the first minute or two the product tends at least to be provocative. But as the films grind on their weary way, one is soon surfeited and eventually nausea begins to stir. What one's reaction would be if partially or wholly inebriated while viewing the films has not been researched.

Further, by way of statement of fact rather than law, it is probably fair to say that the product does not reach the status of "hard core pornography," which term is probably understandable by all and to the proscription of which there is no judicial dissent anywhere in this country.

The jury (requested by defendant) was given special interrogatories, and answered each. The interrogatories and answers on the verdict were as follows:

"Special Verdict

"We, the jury in this action, unanimously find the following special verdict:

"Question 1. Is the film lewd, obscene, indecent, lascivious, or immoral?

"Answer: Yes.

"Question 2. Does said film tend to corrupt the morals of youth?

"Answer: Yes.

"Question 3. Does said film tend to corrupt the morals of others than youth?

"Answer: No.

"Question 4. Does the film depict any immoral, indecent, lewd or lascivious act or suggestion?

"Answer: Yes.

"Question 5. Does the film delineate any material in such a manner as to offend public morals or decency?

"Answer: Yes.

"Question 6. Is the exhibition of said film contrary to good morals?

"Answer: Yes."

(The interrogatories submitted were agreed to by counsel.)

Parenthetically, one can muse that the jury's answer that the film does not tend to corrupt the morals of others than youth is the average human being's reaction that: "Of course such things can't corrupt me."

The district court on December 18, 1956, filed a written opinion and judgment was entered on December 26, 1956, directing the return of the film by Eastman to Hendricks. It is apparent that Eastman does have a problem with the various films of the burlesque type which come to it for processing. The company looks for a definitive decision, a guide which it can rely upon in other cases. In that, it would be a good guess that it may never be satisfied. The law would seem to be in a state of flux and if one can settle upon words for a test, still there will be many, many borderline cases wherein an individual's judgment cannot be an insurable risk.

Adverting to the ground of decision below, the trial court was greatly impressed with the plaintiff's contention that the reels in suit were just part of a production to be entitled, "A Day in the Life of Jennie Lee." (Jennie Lee was described by Hendricks as one of the most prominent burlesque stars on the circuit today.) It thought the incompleteness of the segments and the fact that they were unedited was important. Apparently the thought of the court was that in context the film might be redeemed when "A Day in the Life of Jennie Lee" was complete. Such reasoning this court cannot accept. Here Hendricks, while expansive about his film, was nonetheless vague about how he would have any theme or plot over and above a strip tease presentation. If one assumes arguendo, that the film depicts hard core pornography, surely the burden would shift to Hendricks to show that his ultimate product in context would be something different. Similarly, it would seem the same rule would apply if the film as it is now transcends applicable standards.

This Court has no desire to set itself up as a censor of literature, of art or of such alleged art as is to be found here. It is a dangerous power.

But one must try to find the law—and apply it. Since the trial court handed down its decision herein on the purported "Day in the Life of Jennie Lee" the Supreme Court has been in the field at least six times. The first recent case is Kingsley Books, Inc., v. Brown, corporation counsel, 354 U.S. 436, 77 S.Ct. 1325, 1326, 1 L.Ed.2d 1469, decided June 24, 1957. There the constitutionality of a state obscenity statute, Code Cr.Proc. N.Y. § 22-a, providing for the condemnation under procedural safeguards of books (and other items) "of an indecent character, which [are] obscene, lewd, lascivious, filthy, indecent or disgusting," etc., was at issue. Book-pamphlets entitled "Nights of Horror" were found to contravene the statute. In the New York Court of Appeals the attack was entirely on constitutional grounds. This was book burning, said Kingsley, and mandatory injunctions accomplishing that were unconstitutional, it argued. The Su-

preme Court of the United States upheld, five to four, the finding of constitutionality made by the New York courts. Kingsley apparently assumed the statute in the field was violated if it was constitutional.

On the same day as Kingsley, the decisions, again by a divided court, came down in Roth v. United States and Alberts v. State of California, 354 U.S. 476, 478, 77 S.Ct. 1304, 1 L.Ed.2d 1498. (The latter two cases were jointly considered.) In Roth a criminal judgment of guilt under the federal obscenity statute excluding obscene matter from the mails was involved. Alberts was convicted under the California Penal Code [1] for lewdly keeping for sale obscene and indecent books. Roth said the federal statute was unconstitutional under the First Amendment. Alberts said the California statute violated the Fourteenth. The premise of each case was that the defendant was guilty. Therefore, the cases do not give us specific examples as a standard for a test.

It would seem that the cases stand for the full establishment of "pruriency" as the test in the field. While it is an old word, much of its current vitality in decisions stems from the American Law Institute Model Penal Code. See this definition in Section 207.10(2), Tentative Draft No. 6, 1957, reading as follows:

"* * * A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, i.e. a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters. * * *"

While the concurrence of Mr. Justice Harlan in Alberts and his dissent in Roth point up difficulties with the majority opinion in the cases, to this court it seems, especially in view of statements in Kingsley Books, supra, that pruriency as the synonym for obscenity is the principal element that must now be pursued on these obscenity statutes.

Moving into the cases like this one of Hendricks where the consideration is no longer one of constitutionality, but the hard question of judgment on the facts, one finds three noteworthy cases, noteworthy especially because of the way they were handled by the Supreme Court. The second one in order of decision by a court of appeals, but first in the order of disposition by the high court, was the Ninth Circuit case of Mounce v. United States, 247 F.2d 148, reported in U. S. District Court for the Eastern District of Washington, sub. nom., United States of America v. 4200 Copies of International Journal, 134 F.Supp. 490. This was a United States customs service case involving foreign picture books and pamphlets seized in transit through customs. The prohibitory statute against importing "Any obscene book, pamphlet, paper, writing, * * * print, picture * * *" was involved. See 19 U.S.C.A. § 1305. The trial judge, the late Honorable Sam M. Driver, attempted to classify the pictures, holding some obscene and some not obscene. This met with the approval of this court, Mounce v. United States, supra, this court believing that the Roth case decided after

1. See West's Cal.Penal Code, Ann.1955, § 311.
   "Every person who wilfully and lewdly, either:
   *       *       *       *       *
   "3. Writes, composes, stereotypes, prints, publishes, sells, distributes, keeps for sale, or exhibits any obscene or indecent writing, paper, or book; or designs, copies, draws, engraves, paints, or otherwise prepares any obscene or inde-

   cent picture or print; or molds, cuts, casts, or otherwise makes any obscene or indecent figure; or,
   "4. Writes, composes, or publishes any notice or advertisement of any such writing, paper, book, picture, print or figures; * * *
   *       *       *       *       *
   "6. * * * is guilty of a misdemeanor * * *".

argument here in Mounce presented no difficulties in upholding the lower court.

Certiorari was sought by Mounce. The solicitor general filed a memorandum stating that in his opinion the trial court had used the wrong standard when it said, [134 F.Supp. 493] "If * * * it offends the sense of propriety, morality, and decency of such average person, it is within the bar of the statute" or that the district court evolved contradictory standards.[2] Thus, the solicitor general confessed error. So, on December 9, 1957, the Supreme Court ruled in Mounce (355 U.S. 180, 78 S.Ct. 267, 2 L.Ed.2d 187) as follows:

"Per Curiam.

"The petition for writ of certiorari is granted. Upon consideration of the entire record and confession of error by the Solicitor General the judgment of the United States Court of Appeals for the Ninth Circuit is vacated and the case is remanded to the United States District Court for the consideration in light of Roth v. United States, 354 U.S. 476, 77 S. Ct. 1304, 1 L.Ed.2d 1498."

Mounce has not come back to this court since the Supreme Court's mandate went down to the district court. The Supreme Court could have meant the libel should be dismissed, but it probably meant the trier of fact should reconsider the pictures in the light of "pruriency."

Two other cases must be considered. One is the Ninth Circuit case of One, Inc., v. Olesen, 241 F.2d 772, and the other is Sunshine Book Company v. Summerfield, 101 U.S.App.D.C. 358, 249 F.2d 114. In each case trial courts sustained barring of publications from the mails and were affirmed by courts of appeal.

This time, the solicitor general, as against petitions for certiorari, stoutly attempted by memoranda to hold intact the decisions below. However, both cases, a month after Mounce met the same fate in the Supreme Court, to wit:

"Per Curiam:

"The petition for writ of certiorari is granted and the judgment of the United States Court of Appeals [for the respective circuit] is reversed. Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498." 355 U.S. 371, 78 S.Ct. 364, 2 L.Ed.2d 352.

It is fair to say that in Sunshine Book Company the publications involved two illustrated periodicals ostensibly for nudists or for those toying with accepting nudism as a way of life.

One, Inc., involved[3] the magazine "One," a magazine for sex deviates or for the encouragement of sex deviation. Of course, there is much current thought that adult sex deviates should be left alone so long as they leave children alone and do not make public displays of their deviations. The thought is that many of the statutes in the field should be repealed. Such current advocacy by some is only noted in passing. And one cannot believe that such was the underlying basis of the per curiam reversal in One, Inc., v. Olesen, supra. To this court, the contents of the publication seemed clearly objectionable as "obscenity," just as "hard core" pornography would be, and had little doubt that most people would so regard it. This court simply takes the view that the only sensible explanation of the reversal of One, Inc., is the Supreme Court decided "the wrong yardstick" was used. Also, such must have

---

2. The district court made the following finding of fact:

"Plaintiff's Exhibits * * * are obscene and immoral in that the pictures and photographs contained in said publications would so much arouse the salacity of persons into whose hands they are liable to fall as to outweigh any

artistic, scientific or other merits, they may have in other person's hands."

The solicitor general thought the standard so indicated in the finding of facts approximated the standard of the Supreme Court in Roth.

3. Since the Supreme Court reversal, the One, Inc., case has not come back to this Court of Appeals.

been the meaning of the decision in Sunshine Book.

So what is to be made of the affirmances in Kingsley Books, Roth and Alberts, and the summary reversals in Mounce, One, Inc., and Sunshine Book Company? It may be to oversimplify, but it looks (as indicated above) as if "prurient" is to be the talisman. And out of "prurient" it would seem that obscenity is shifting from the standard of distasteful to a majority of people to a standard of disgusting, really lewd, shameful, or excites morbid interest in sex. Perhaps, the shift is from "bad" to "awful."

Unless this court is mistaken, it would appear too that the Supreme Court may be tending toward a stricter yardstick in measuring suppression in advance, so-called book burning, as contrasted vis-a-vis criminal convictions for the same publication.

In short, there seems to emerge from the cases the proposition that obscenity in the standard of pruriency must really "smell," not just be of slight "odor." It would seem to be a corollary that state statutes must be not too strictly construed in favor of "burning" or they will fail to withstand a constitutional attack. Also, it is possible, as suggested by Mr. Justice Harlan in his opinion on Roth and Alberts, that in the future the Supreme Court may be more tolerant of state restrictions (because they are not repressive everywhere at the same time) than the court will be with federal statutes which are repressive throughout the nation. Perhaps the postmaster and the customs man will be held with a tighter rein than a counterpart in the state.

It is well to note that in Roth and Alberts the defense insisted upon an element of "clear and present danger." It appears that this principle has been rejected for this field by the majority of the Supreme Court.

■ Returning to the case before us, the trial court partially ruled upon a basis which it stated as follows: "As plaintiff's claim does not rest upon an illegal contract or transaction but is a pure replevin action, this latter defense is not valid here." As authority it relied upon California Grape Control Board v. Boothe Fruit Co., 220 Cal. 279, 29 P. 2d 857, and Franklin v. Mortgage Guaranty & Security Co., 9 Cir., 57 F.2d 834. Without fully discussing the cases and the principles involved, this court is satisfied, assuming that these films fall outside the limits of what is permissible in California,[4] that California would follow the reasoning of such cases as Lew U. Fon v. Chambers, 68 Cal.App. 244, 228 P. 865, and would not require the return by Eastman to Hendricks of the film.

After all of the foregoing discussion, there yet remains the question of what to do with the case. Here we have sensuous movement as an additional dimension which was not present in Sunshine Book, Mounce, One, Inc., Roth, Alberts and Kingsley. It occurs to this court, under the Supreme Court's rather rigid standard or tests, which must be met before suppression can be allowed, this is obviously a border line case. It may well be that this sort of a motion picture was intended to be proscribed by the California legislature and by the Los Angeles City Council. It is hard to be sanguine about it.

It appears that People v. Wepplo, 78 Cal.App.2d Supp. 959, 178 P.2d 583, is the projection from which the Alberts case proceeded. It further appears that the trial court here had the Wepplo case in mind. The instructions seem to follow Wepplo substantially.

The case will be reversed and remanded to the trial court. Perhaps, the case can be put within Roth by adding to the interrogatories the element of pruriency. That is to say, does the film tend to corrupt, etc., *"by inciting lascivious*

---

4. Eastman also relied on Section 1667, West's Ann.Civil Code of California and Sections 41.01, 41.01.1 and 41.13 of the Los Angeles Municipal Code. It may be doubted that the municipal ordinance here, although using more words, adds very much to the state statute.

*thoughts or arousing lustful thoughts?"* (Emphasis supplied.) In the interrogatories submitted to the jury concerning the corruption of morals the element of effect was omitted or minimized.

It may be said that this opinion merely parts the hair on the left instead of the right. Maybe so, but it is too close to Mounce in its present posture to affirm or flatly reverse. So the effort here is to get the case within the rule of Roth and Alberts.

There is no dispute here as to the content of the film. This court is of the opinion, nevertheless, on such a case as this, tottering as it does, that the case should not be disturbed here whichever way the jury finds on obscenity and its companion elements. Or if judge tried, again perhaps it should not be disturbed.

Irrespective of Roth, Alberts and the other cases, the case should be reversed because of the partial reliance by the court on the theory that the picture should be returned because it was not a part of an illegal contract. The California law does not seem to support it. Further, as indicated, if this film, as is, offends or is about to offend California law, then, if Hendricks can rescue it by offering some other context, the burden at least is his. While not conclusive, the very gauge of the film at least suggests that it is doubtful if a "Day in the Life of Jennie Lee" was ever intended to be much more than it is. The court should not let itself be imposed upon with nonsense.

Again, this court states that Eastman Kodak cannot hope to get any decision in this field which will serve as an infallible guide. He who tries the cases and reviews the decision will always be a factor which cannot be wholly eliminated or fully anticipated. There are certain risks that must always be taken of someone else's view, just as there are the risks inherent in driving an automobile. If one has an accident, someone as a matter of opinion will decide close cases.

This court has not considered whether under California law or the Federal Declaratory Judgment Act [5] the use of declaratory judgment procedure by the processor is available. And it is deemed not appropriate to consider it here.

Reversed and remanded for proceedings consistent with this opinion.