**STATE, Plaintiff v. CRARY, Defendant.**

Common Pleas Court, Lucas County.

No. 53269.   Decided January 6, 1959.

Anthony G. Pizza, for state.
Roi Becker, for defendant.

## OPINION

By ALEXANDER, J.

The affidavit charges that defendant, a drug store proprietor, in violation of §2151.41 R. C., "unlawfully acted in a way tending to cause the delinquency" of a 14-year-old boy by selling him a magazine containing "obscene, lewd and lascivious pictures" and "stories of immoral deeds and lust."

The defendant entered a plea of not guilty. Upon the trial the evidence was undisputed that defendant did sell the boy one magazine named in the affidavit. It would appear at first blush that defendant's fate hangs on the nature of the pictures and reading matter therein.

In our opinion, very few people, old or young, upon examining the exhibit would find the reading matter worse than crude, tiresome, and in spots vulgar. No bad words appear. One highly improbable story could be suggestive to some; but nothing happens and it is innocent as a lamb compared to some of our modern best-sellers and many of our classics.

The pictures, in our opinion, are in exceedingly bad taste. They mostly depict females "as nude as the law allows." The poses are frequently awkward or grotesque. There is no complete nudity; all strategic points are covered or hidden. Except for some pathologically tumescent bosoms, the nudity on view in the pictures is no more revolting, pleasing, disgusting, alluring, depraving, delighting, demoralizing, or what you wish, than the nudity on view in the flesh on our respectable stages, or at our beaches and swimming pools; or displayed by advertisers in various media, or flaunted on the pages of highly respected national magazines.

The prosecuting attorney in his brief for the state reminds us that §2905.34 R. C., makes it a crime to possess or sell matter that is "obscene, lewd, lascivious," etc. Most cities have ordinances of similar tenor. Violations of these laws are normally prosecuted in municipal, police or magistrates' courts. We find no Ohio case where a juvenile court has been called upon to apply such a law.

But in any court it is hard to know what is or is not obscene, etc. Clergy, censors, courts, legislators, publishers, producers, readers, viewers, all are apt to hold different views or the same views in differing degrees.

Rev. Harold C. Gardiner, S. J., in his new book: "Catholic Viewpoint on Censorship" realizes that nudity may not be obscene in itself. He would define obscenity as "the intrinsic tendency or bent of the work to arouse sexual passion, or, to put it more concretely, the motions of the genital apparatus which are preparatory to the complete act of sexual union."

The Supreme Court of the United States in its latest bout with the problem was unable to reach complete agreement: Roth v. U. S., 354 U. S. 476 (1957). In the majority opinion by Mr. Justice Brennan we read (p. 487): "Obscene material is material which deals with sex in a manner appealing to prurient interest." A footnote explains: "I. e., material having a tendency to excite lustful thoughts." Chief Justice Warren concurred but wrote his own opinion. There were three dissents. Mr. Justice Harlan, in his dissenting opinion (p. 499) quoted from tenative draft No. 6 of the Model Penal Code prepared by the American Law Institute: "A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest. . . ." He then quotes from the comment of the ALI scholars:

"We reject the prevailing test of tendency to arouse lustful thoughts or desires because it is unrealistically broad for a society that plainly tolerates a great deal of erotic interest in literature, advertising, and art, and because regulation of thought or desire, unconnected with overt misbehavior, raises the most acute constitutional as well as practical difficulties. We likewise reject the common definition of obscene as that which 'tends to corrupt or debase.' If this means anything different from tendency to arouse lustful thought and desire, it suggests that change of character or actual misbehavior follows from contact with obscenity. Evidence of such consequences is lacking. . . ."

"All the attempted definitions thus far advanced (even the 156 page essay by Blackstone)" says James M. Smith in the DAILY HERALD of Brown University (Mar. 13, 1958,) "have suffered from the more or less fatal defect of being more obscure than the term itself (is 'lurid,' 'lascivious,' 'indecent,' or even 'prurient' clearer than 'obscene'?)."

When so very many wiser heads than ours after so very many years find themselves in honest disagreement as to what constitutes obscenity, we hardly feel called upon to attempt a home-made definition of our own, nor yet to choose among the many variations available to us.

If the exhibit in the present case could be submitted to a jury it is likely some members might say the pictures were obscene or prurient or something; others might find just the opposite. If we had to decide this

issue we would be unable to find beyond a reasonable doubt that the pictures fall within the purview of our state law against obscenity, or are such as it is intended to proscribe.

But we don't believe we have to decide this issue. As stated above this defendant is charged not with "contributing to delinquency," nor with "selling obscene material" but with "acting in a way tending to cause the delinquency" of a certain boy.

The classic example of a contributor to delinquency is, of course, Fagin. Yet he could not be said to have contributed to the delinquency of Oliver Twist (whom he taught to steal) unless and until Oliver stole something. But all the time he was teaching Oliver no one could deny he was acting in a way tending to cause Oliver's delinquency.

On the other hand, could any one contend that a parent acted in a way tending to cause his adolescent child's delinquency by taking him to a Broadway "musical" or by leaving a copy of a leading national magazine where the child could turn the pages and see some nude pictures?

In 1939 a learned lawyer-penologist at a meeting of the American Prison Association commented (not for publication): "Under that statute you could convict a drunk for staggering out of a saloon so that a passing child could see his condition and go imitate him." This attempted **reductio ab absurdum** overlooks two facts: such a reaction is an extremely remote possibility and far from a reasonable certainty; moreover, it is just as possible that the child would be so frightened by the spectacle that he would resolve never to take a drink.

When the phrase "acting in a way tending to cause delinquency" was interpolated in the existing statute governing contributing to delinquency in 1913, 103 Session Laws 873, it was intended as a preventive measure. It would lock the barn before the horse was stolen. It would put Fagin out of business even if his pupils hadn't stolen a thing. It aimed to forestall delinquency before it occurred.

The difference was recognized between something which had already caused a child to commit an overt delinquent act, and an act or course of action calculated to cause a child to commit a delinquent act in the future. The former was a **fait accompli**; the child had committed the offense and if it was possible to trace its causation wholly or partially back to specific conduct on the part of an adult, the adult was to be punished therefor.

Apparently the trouble with the law was that the horse had to be stolen before the barn could be locked. The law must be broadened to help forestall juvenile delinquency. But as a preventive measure no legislator could conceivably be expected to anticipate all the acts that could reasonably be expected to cause the delinquency of any given juvenile. More than likely that is the reason the legislature adopted the simple, non-technical language "acting in a way tending to cause."

Ever since the enactment of this clause the juvenile court judges of Ohio have realized the tremendous responsibility imposed upon them by the very breadth of this language. Consequently in all the 45 years since its enactment we do not find one reported case in which a juvenile court judge has been accused of misapplying the law in discharge of the

frightening duty to determine under the facts before him exactly what does "tend to cause delinquency" in the particular boy before him.

This language is not as precise as some might desire. Still, it seems to have been found precise enough. It is no more unprecise than the common concept of negligence. At any rate the law has proven workable and practicable, and nobody to date has offered a superior substitute to accomplish its laudable aim. To quote again from the opinion in the Roth case, supra (p. 491):

". . . This Court, however, has consistently held that lack of precision is not itself offensive to the requirement of due process. '. . . (T)he Constitution does not require impossible standards'; all that is required is that the language 'conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. . . .' United States v. Petrillo, 332 U. S. 1, 7-8. . . . . . . That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense. . . . (Citing cases.)

The U. S. Supreme Court has considered and rejected the application of the Holmesian test of "clear and present danger" in respect of the effect of questioned material in determining whether such material is obscene. Yet that test seems hardly more rigid or difficult to apply than the self-imposed judicial restraint of Ohio's juvenile courts in determining what constitutes "acting in a way."

Apparently the judges have not forgotten that they are dealing with a criminal statute and that it must be strictly construed. No defendant may be deprived of life, liberty or property for doing something which might just possibly sometime, somewhere lead to some child's becoming delinquent. Possibility must give way to comparative if not absolute certainty. The delinquency which the law is trying to prevent must be fairly imminent, a reasonably certain result of the act complained of, reasonably sure to befall a certain child in a reasonable time. That seems to be the way the courts have been applying this statute. Apparently they have held that a single act or even a course of action which is merely likely or apt or liable to lead to a given child's overt act of delinquency is too remote a causative factor to warrant depriving a citizen of his liberty. Unless the causal connection be clear and a delinquent act be reasonably sure to follow, the judges refuse to be convinced beyond a reasonable doubt that the act complained of "tends to cause" the delinquency of the child.

Since the present prosecution is solely for "acting in a way tending to cause," there is, of course, no evidence that the boy has committed any delinquent act; nor even that his thoughts have been affected or that he has indulged in any sexual fantasy as a result of looking at the nude pictures. Even if the latter were the case, that would not constitute legal delinquency, nor would it be evidence of imminent delinquency. To constitute delinquency there must be more than lustful thoughts or sexual fantasies or prurience; there must be overt delinquent behavior.

In the spring of 1958 the Psychology Department of Brown Univer-

sity made a study of the possible influence of salacious material on behavior. In their report (BROWN DAILY HERALD, May 13, 1958) they point out that (p. 8):

". . . there is some evidence that delinquent behavior is actually lessened by 'bad' reading, etc. The general idea is that unacceptable impulses which can gain expression through our fantasy activities will not need to be expressed in unacceptable actions. Among those who have expressed such a view in the case of adults is Dr. Benjamin Karpman who has concluded that 'contrary to popular misconception, people who read salacious literature are less likely to become sexual offenders than those who do not, for the reason that such reading often neutralizes what aberrant sexual interests they may have.'"

The report concludes:

"In summary, then, as psychologists we assert that there is no reliable evidence that reading or other fantasy activities lead to anti-social behavior. There is evidence that such reading or fantasy activity is not an important contributor to delinquent behavior."

This coincides pretty well with the conclusions of the legal scholars of the American Law Institute quoted above.

(For a recent discussion of U. S. Supreme Court cases on "obscenity," which incidentally point up similarities and differences between laws proscribing "obscenity" and the "tending to cause delinquency" statute, see The "Comstock Load"—Obscenity and the Law, by Prof. Henry H. Foster, University of Pittsburgh Law School, in The Journal of Criminal Law, Criminology and Police Science, Vol. 48, No. 3, October, 1957.)

In view of the premises, we find the defendant not guilty of acting in a way tending to cause the delinquency of the boy named. Defendant discharged; bond released.