### CITY OF MIAMI BEACH v. BENNETT.
#### No. 100577.
Municipal Court of Miami Beach.

December 18, 1959.

Wilson C. McGee, Assistant City Attorney, for the city.

J. Ben Watkins, Miami, for the defendants.

ALBERT H. SAPERSTEIN, Judge.

The opinion and judgment herein entered is also applicable to each of the following individual cases and named defendants — no. 100592, Julius Cohen; no. 100580, Joseph Mindlin; and no. 100579, Moe Kalisch.

Defendants are each charged under section 22.36 of the Code of the City of Miami Beach, 1950, with displaying and selling at their respective places of business within the city certain books, specifically named and identified in each respective charge, such books containing obscene, immoral, indecent language, and manifestly tending to corrupt the morals of youth. By stipulation of counsel for the defendants and for the city, it was agreed that actual trial proceed on one of the cases, in which Jessie Bennett is the named defendant, but that all motions, arguments and applicable testimony be deemed to have been presented individually in all of the cases. Other stipulations of fact appear in the record to which no reference need be made. A motion for jury trial was denied and a motion to quash the affidavit, charge and violation was also denied. All of the books named in the charges were admitted in evidence as applicable to the respective cases without objection and the trial was recessed to permit the court time to review the evidence.

The sole issue of fact now before the court appears to be whether or not the books referred to, individually, but each comprehensively, that is, when read as a whole and not by the arbitrary selection of particular passages out of context, contains obscene, immoral or indecent language manifestly tending to corrupt the morals of youth.

Before embarking upon the actual reading it was necessary that the court establish for its own guidance certain objectives, beacons and guide-posts in order to avoid insofar as it was reasonably possible to do so any subjective and personal reaction, or any individual bias, prejudice or concept of taste which might tend to affect or becloud an objective, impartial and judicial conclusion.

By way of fundamental objective control, the court held steadfastly in mind an ever present adherence to judicial concepts of constitutional guarantees of free press and free speech. By way of immediate beacon, the court held consciously in the forefront of its mind the recent opinion in Grove Press, Inc. v. Christenberry, 175 Fed. Supp. 488, U.S. District Ct., S.D., New York, commonly known as the "Lady Chatterley's Lover" case, and this opinion admittedly borrows liberally from the wording, comments, and principles therein set forth.

By way of guide-posts, the court held firmly to the definitive standard approved in Roth v. United States, 354 U.S. 476, 77 S. Ct. 1304, 1 L. Ed. 2d 1498, and followed in the Grove Press case, namely —"whether to the average person applying contemporary community standards, the attempted theme of the material taken as a whole appeals to the prurient interest." In connection with

this standard the court also kept in mind common knowledge as to general community toleration of analogous or similar subjects in the Bible, the works of Shakespeare, Milton, and others within the elastic era of the good old Anglo-Saxon days; and to the more contemporary and current authors and playwrights whose delineation of the so called "realities of life" have been, or are in the process of becoming, traditionally and generally accepted literary art within the current and unwritten moral code of the community concerning sex and sex relations. The court was also aware of the fluidity of fashion, not only in dress and conduct, but also of social attitudes as reflected by common observation in the community.

In setting up these guide-posts the court was cognizant of the fact that it is not and cannot be a public censor, nor a keeper of the public morals — that the principles of freedom of speech, freedom of press and encouragement rather than restriction of the dissemination of ideas and information are public treasures not to be entrusted to any one individual or group of individuals of a limited class, even judges, and even when their idealistic intentions are unquestioned. However, in the disposition of this case the court is concerned with specific instances and makes no effort to draw broad lines for the general guidance of human behavior beginning with the words "Thou shalt" or "Thou shalt not." But the court's duty to protect cherished rights and principles under direct, indirect or disguised attack is no greater and no more of a judicial responsibility than is its duty to protect these same principles from prostitution, perversion and abuse when they are honored only by lip-service to legal clichés orbiting in a vacuum. If freedom of speech and freedom of the press is to be truly free, it must be free to protect itself as well as to assert itself. There is no constitutional right under man made law (See Roth v. U.S.) nor any moral right under God made law to engage in obscenity, immorality or indecency in the guise of art or literature, especially when it strip-teases from under the twin cloaks of the claim of constitutional rights to freedom of expression on the one hand, and disclaimer of constitutional limitations upon literary or artistic laissez-faire on the other.

It was, therefore, comprehensively within the mental aura outlined above that the court undertook to examine the above mentioned books.

It would serve no useful purpose for the court to dissect in minute detail, by way of individual book reviews, each of the items in evidence. The court has conscientiously examined and read each of the books in its entirety. The predominant subject of each book

is Sex — however, since the portrayal or discussion, even publicly, of sex is not per se obscene, it is not the subject itself but the manner in, and purpose for which the subject is exploited and used as a carrier for assorted stock themes, with which this court must concern itself. In the light of the opinion in the Grove Press case, this necessarily requires consideration of the physical make up and outward appearance of the books as well as the context.

Each of the books is of the familiar "paper-back" or "pocket-book" type of publication. In terms of genetics (and appropriately enough in this case) the "Father" may have been a hard-cover book, and the "Mother" a magazine. The child most closely resembles the mother. Each book contains, in addition to the story itself, a brightly colored, eye-attracting, close-up photograph-type of drawing on its front cover, apparently depicting visually a scene described somewhere in the text. Also appearing prominently on the cover is the name of the book, generally in color and easily visible at more than arm's length. There also appears the name of the author, the name of the publisher, the price (consistently 35c), and in each instance, what appears to the casual eye to be a "blurb" which might be either a quotation from the text or a capsule comment on the nature of the story.

The pictures referred to depict scenes in which physical sex is obvious, flamboyant, or tantalizing and suggestive. The pictures are in evidence as parts of the books and need not be further described here. The court is not required to rule upon the legality of the covers alone, but the covers, with the pictures and the printing, are obviously designed and intended to reach out from the newsstand shelf and fasten themselves upon the casual eye of the potential purchaser. In some circles this may be considered to be craftsman-like salesmanship, advertising or packaging. Each of the books contains on the first page following the cover, an actual excerpt or a summarized brief of the text material. It is unnecessary to quote here these excerpts, which are also part of the evidence. Suffice it to say that the excerpts, and to some lesser degree the summaries, are highly and frankly descriptive passages of sensual experience, sensations and arousements, and generally alien, especially when read out of context, to the plot or theme of the story. That the cover, the "blurb" above referred to, and fly-leaf material, even if not definitively obscene, are obviously sensual and appear to be deliberately designed and intended quickly to affect and arouse the interest of the examiner in the sex aspects of the book prior to any consideration of the theme, plot or social message, is also obvious.

Finally, with reference to physical make-up, almost every book contains an addendum to the story, which inserted material has no relationship to the story whatsoever, but which deals with legal decisions concerning obscene literature test cases in which the publishers were victorious. This court can only speculate upon the purpose for the inclusion of this added material — either that it is intended to salve the conscience of a reader who might experience a sense of personal degradation and loss of self-respect upon completing the reading, or to convince the potential purchaser examining the book that he is not about to purchase "dirty" reading matter.

It appears to the court, therefore, that in their physical characteristics alone, these books fall well outside the protecting words of Judge Woolsey in the case of the book "Ulysses", 5 Fed. Supp. 182, where he observes —"There is nothing of the lear of the sensualist in the promotion or methods of distribution of this book;" and well outside of the opinion in the Grove Press case, where in holding the book to be a work of literary art, the court notably stresses the evidence showing that —". . . the format and composition of the volume, the advertising and promotional material and the whole approach to publication, treat the book as a serious work of literature . . . There has been no attempt by the publisher to appeal to prurience or the prurient minded." The court further notes that the preface was written by Archibald MacLeish, former Librarian of Congress, Pulitzer Prize winner and a distinguished literary figure; that there was an introduction by a professor of English Literature at the University of California; that the book was favorably received by the distinguished literary critics of leading newspapers and periodicals with regard to its literary and artistic importance. No such evidence or even pretenses of respectability other than the opinion of one witness for the defense, of whom more later, appears here. So much for the physical aspects.

In the following discussion of the text material, the court does not feel, in dealing generally and not individually book by book with the cases, that any of the individual defendants are being deprived of any right of any individual attention. What will be said applies equally and individually to each of the books, and may depart from universal application only in degree and not in substance. Once again applying the principles set forth in the Roth and Grove Press cases, this court finds that the plots and themes, such as they are, are unrelated to service as vehicles for serious sociological or philosophical studies, or as messages of "redeeming social importance." The court, admittedly as a layman of the community, and not as an experienced art or literary critic, looked for but found

no descriptive passages of rare literary beauty. On the contrary, passages dealing in unabashed crudity of detail with the sex acts, or with related conversations and descriptions, or with physiological functions of the animal body, more often than not, had only the most tenuous basic relation to the development of theme or plot, but instead appeared both as a means and an end in and to themselves to the depiction of lust, lewdness, obscenity and immorality, and often in an author-created atmosphere implying casual social acceptance and even moral justification for acts of admitted illegality. These descriptions may be reflective of the rugged facets of life in certain quarters of any community, and the court is well aware of the fact that scenes, conversations and acts similar to those depicted might well be occurring at this very moment within the boundaries of this community — but filth or beauty are nonetheless filth or beauty because they happen to be real and factual and not merely imaginative.

A witness for the defense, offered as an expert, testified that in his opinion these books were comparative to well known literary classics and therefore not violative of the standards above discussed. The record will indicate why little weight was given to his testimony, but even this witness admitted that if a book contained matter which he did consider obscene and which was not related to nor necessary to the plot or theme, such book would be objectionable as a whole.

It should also be noted in passing that the so called good old fashioned Anglo-Saxon four letter words, which seem to have acquired quasi-social acceptance under current community standards, appear not only in the conversations of characters where they might well be considered licensed for literary development of the character, but also they appear with frequency in passages in which the author speaks directly to the reader by way of description or information to carry on the story. It occurred to the court that the average normal reader might well resent this manner of personal address.

On the basis, therefore, of the judicial principles, standards and comparisons above set forth as applicable to the books herein under consideration, this court can come to no other judicial conclusion but that the books are intended to, and do in fact appeal to the prurient interest; that they do contain obscene, immoral and indecent language in which lust laughs at the locksmith of legislative limitations; that they are being exploited and sold "for the purpose of profiting by the tittilation of the dirty-minded" even though sold openly to the public and not furtively by dealers in smut; that the words of Justice Frankfurter — "There is such a thing as dirt

for dirt's sake, or to be more accurate, dirt for money's sake" are particularly applicable here; that the continued reading of these books must necessarily distort, corrupt, and sabotage the efforts of the church, the schools, the home and the civic community to build and maintain the moral character, not only of youth, but ultimately of the adulthood which is the heritage of youth, and which includes not only the irresponsible, the immature or the sensually minded, but also the average person of normal sensual impulses applying contemporary community standards.

The testimony of the defendants concerning lack of scienter is deemed inapplicable to the ordinance under which they are charged.

For the reasons above set forth, it is the verdict and judgment of this court that the defendants, and each of them are respectively guilty of the charges set forth in their respective cases.