In re **LOUISIANA NEWS COMPANY;** Jerome Molasky and Allan Molasky, Individually and as Trustees and as Partners v. Provosty A. DAYRIES, Individually and as Superintendent of Police of the City of New Orleans; Joseph I. Giarrusso, Individually and as Deputy Superintendent of Police of the City of New Orleans; Joseph H. Murry, Individually and as a Lieutenant assigned to the Public Relations Division of the New Orleans Police Department; Joseph Battaglia, Individually and as a Patrolman of the New Orleans Police Department; Richard A. Dowling, Individually and as District Attorney for the Parish of Orleans; Richard S. McBride, Jr., Individually and as Assistant District Attorney for the Parish of Orleans.

Civ. A. No. 9853.

United States District Court
E. D. Louisiana.
July 12, 1960.

# 242

William M. Lucas, Jr., Morey L. Sear, New Orleans, La., for plaintiff.

Stanley Fleishman, Hollywood, Cal., for plaintiff.

Alvin J. Liska, City Atty., Ernest L. Salatich and Beuker F. Amann, Asst. City Attys., Henry B. Curtis, Special Counsel for City Atty., James David McNeill, Walter Doane, Richard A. Dowling, Richard S. McBride, New Orleans, La., for defendants.

Before WISDOM, Circuit Judge, and CHRISTENBERRY and WRIGHT, District Judges.

WISDOM, Circuit Judge.

The plaintiffs [1]—all of the partners of the Louisiana News Company—filed a complaint against the Superintendent of Police of the City of New Orleans, the

1. The complainants are: Jerome Molasky; Allan Molasky; Jerome Molasky, Trustee for Susan Kay Molasky, under trust agreement, in which Dorothy Molasky is grantor; Jerome Molasky, Trustee for Susan Kay Molasky, under trust agreement in which William Molasky is grantor; Allan Molasky, Trustee for Mark Molasky, under trust agreement in which Dorothy Molasky is grantor; Allan Molasky, Trustee for Mark Molasky, under trust agreement in which William Molasky is grantor; Allan Molasky, Trustee for Marti Ellen Molasky, under

Orleans Parish District Attorney, and others.[2] The Louisiana News Company is the sole wholesale distributor of magazines and periodicals in the New Orleans area. Among the publications the Company distributes are (1) certain "pin-up" or "girlie" magazines, the archetype of which is probably *Playboy*, and (2) certain magazines purporting to promote the cult of nudism. According to the complaint, the defendants, under color of the Louisiana Obscenity Statute, LSA–R.S. 14:106, declared war against the distribution and sale of these publications in the New Orleans area. The record shows that the campaign opened with exhortations, progressed to threats, was brought to a climax by wholesale seizures of the complete stock of each allegedly obscene periodical,[3] and culminated in the arrest and prosecution of the Company's manager.

The plaintiffs contend that the publications under attack enjoy constitutional protection under the First and Fourteenth Amendments; that the Louisiana

trust agreement in which Dorothy Molasky is grantor; Allan Molasky, Trustee for Marti Ellen Molasky, under trust agreement in which William Molasky is grantor. The Louisiana News Company is a commercial partnership domiciled in the Parish of Orleans and doing business in the Parishes of Orleans, St. Bernard and Jefferson.

2. The defendants are: Provosty A. Dayries, Individually and as Superintendent of Police of the City of New Orleans; Joseph I. Giarrusso, Individually and as Deputy Superintendent of Police of the City of New Orleans; Joseph H. Murry, Individually and as a Lieutenant assigned to the Public Relations Division of the New Orleans Police Department; Joseph Battaglia, Individually and as a Patrolman of the New Orleans Police Department; Richard A. Dowling, Individually and as District Attorney for the Parish of Orleans; Richard S. McBride, Jr., Individually and as Assistant District Attorney for the Parish of Orleans.

3. 5862 magazines were seized at the Louisiana News Company, 76 at Gilmore's Newsstand, and 609 at Oliver's Newsstand. The titles were:

| | | |
|---|---|---|
| 472 | Copies | Vol. 2 No. 1 Mermaid |
| 32 | " | 7–11 March |
| 9 | " | No. 1 Figure Annual |
| 4 | " | March Rogue |
| 264 | " | Gent—April |
| 172 | " | Caper—May |
| 3 | " | Fling—Vol. 3 |
| 3 | " | Spree—Vol. 1 No. 15 |
| 1 | " | Sir Knight—Vol. 1 No. 15 |
| 1 | " | Art & Camera Annual No. 1 |
| 1 | " | American Sunbather—1960 Ann. |
| 1 | " | Dude—March |
| 1 | " | Plush Annual |
| 1 | " | Hi-Life—March |
| 1 | " | Escapades—Annual 1960 |
| 456 | " | Adam—Vol. 4 No. 3 |
| 20 | " | Modern Sunbathing—March |
| 1 | " | Adam Bedside Reader—No. 3 |
| 15 | " | Nuggett—April |
| 58 | " | Sunbathing Revue—Spring 1960 |
| 174 | " | Jem—April |
| 47 | " | Modern Man—March |
| 69 | " | Scamp—May |
| 1 | " | Venus (Giant Bonus) |
| 55 | " | Figure Studies Annual |
| 1300 | " | Venus—Vol. 2 No. 1 |
| 1500 | " | Plush—Vol. 2 No. 1 |
| 1200 | " | Hi-Life—May |

Obscenity Statute is unconstitutional;[4] that the seizures were arbitrary and in disregard of due process; that the effect of defendants' threats and the seizure of the publications is to impose a prior restraint or censorship[5] and a secondary boycott of the distributor and its retailers. The plaintiffs ask for an injunction: (1) requiring the return of all publications seized and restraining the defendants from future seizures of any publications, except those numbers of each title, not to exceed five copies of each, needed to facilitate the prosecution of the Company or its agents and employees; (2) restraining the defendants from "interfering with the business operations of or threatening distributor, Louisiana News Company, or any of its agents or employees, or any of its customers, to-wit: retail outlets for magazines, books and periodicals, with a criminal prosecution and thus imposing a prior restrain or censorship on magazines, books and periodicals, and from encouraging primary and/or secondary boycotts of the distributor or the retailers of magazines, books and periodicals in the New Orleans Area and its environs". The plaintiffs ask that the court declare that they have the right to distribute and sell all publications free of threats, coercion, and harassment, and free of primary or secondary boycotts against the Company or the Company's customers. They ask that the court enjoin defendants from interfering with the distribution of publications transported in interstate commerce; from unlawful seizures of vast quantities of magazines; and from preventing the free distribution of any or all publications. The plaintiffs ask the court to declare the Louisiana Obscenity Statute unconstitutional and enjoin defendants from enforcing the pertinent provisions of the Act. The plaintiffs assert a claim of $100,000 for actual damages and $50,000 for exemplary damages.

■ Diversity of citizenship, the existence of a federal question, and the deprivation of civil rights are invoked as grounds of jurisdiction. 28 U.S.C.A. §§ 1331, 1332, 1343. This court therefore has jurisdiction of the complaint.

The statute is attacked on several grounds. First, it is said to condemn mere possession of an obscene publication without knowledge of its offensive character, in contravention of the rule laid down in Smith v. People of State of California, 1959, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205. In Smith v. People of State of California the Supreme Court held that such enactments violate the freedom of the press safeguarded against state infringement by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Second, the statute is assailed as constitutionally inadequate in the absence of supplementing "censorship standards" established by legislative or judicial declaration, under Roth v. United States, 1957, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498. Finally, the claim is advanced that the Louisiana Supreme Court's ruling in State v. Christine, 239 La. 259, 118 So.2d 403, 412, on rehearing, holding paragraph (3), LSA–R.S. 14:106, void as "too vague and indefinite" under the state constitution, invalidates the en-

4. Hence, the establishment of a statutory three-judge court to hear the case. 28 U.S.C.A. § 2281.

5. In H. M. H. Publishing Co. v. Garrett, D.C.Ind.1957, 151 F.Supp. 903, 905, the court held: "The practical effect of the deputy prosecutor's action in furnishing the list of magazines to Henderson's * * * by K and H News Service. * * * The prosecutor's action in issuing a list of magazines that he considered to be pernicious was accompa-

nied by an implied threat of prosecution. His action amounted to censorship, and it was effective. The blacklisted magazines were immediately withdrawn from sale. Thus, the prosecutor brought about a 'previous restraint' of the circulation of the magazine published by the plaintiff. A previous restraint of the publication or circulation or printed matter is inconsistent with the American conception of the liberty of the press, * * *"

tire statute, including paragraph (2) invoked here by the defendants.[6]

██ It is unnecessary to decide these constitutional questions. Adequate justice may be done without passing on the validity of the statute. And, in view of the pending state court prosecution, *which we are not asked to stay,* where the same constitutional issues are being raised, we consider it proper at this point not to attempt an interpretation of the challenged provision. This limited abstention is especially appropriate when, without denying substantial relief to those who invoke our intercession, we may avoid decision on constitutional questions or at least defer decision until the Louisiana courts have spoken authoritatively on the Act. Accordingly, for the present, we shall assume, without deciding, that the Louisiana Obscenity Statute is constitutional and otherwise valid.

 But so assuming, it does not · follow that the acts done, particularly the seizures made, under the purported authority of the statute were proper.

The record shows that the defendants resorted to a number of methods to deter the distribution and sale of certain magazines showing cartoons and photographs of women in various stages of dress and undress. The defendants' most effective weapon, of course, was the seizure, wholesale, of all copies found of the particular issue of an allegedly offensive publication. The seizures were made sometimes under a warrant, sometimes not. That does not concern us here. Nor need we consider the validity of the claim that obscene publications are subject to seizure as "contraband" or as "instruments of crime". As we see it, however well meaning may be the *purpose* of the seizure,[7] no seizure is valid if it is the product of an arbitrary, unreasonable rule of thumb.

██ The validity of the seizures is governed by the standard employed. Here, the Superintendent of Police and his Deputy instructed the police officers that the sole test to determine if a publication was obscene was whether the publication contained a picture showing "bare breasts or bare buttocks".[8]

---

6. Paragraphs (2) and (3) of the Louisiana Obscenity Statute define obscenity as the "intentional":

"(2) Production, sale, exhibition, possession with intention to display, exhibit, or sell, or the advertisement of, any obscene, lewd, lascivious, filthy, or sexually indecent print, picture, motion picture, written composition, model, instrument, contrivance or thing of whatsoever description; or

"(3) Performance by any person, or the showing or display of any picture or motion picture, in any public place or in any public manner, of any act of lewdness or indecency, grossly scandalous and tending to debauch the morals and manners of the people * * *."

7. We note that the seizures cannot be justified as a means of securing useful "evidence" for the criminal prosecution, and that the order here rendered will not embarrass that proceeding. The claim that the seizure of all copies of each publication was necessary to the criminal prosecution is patently unfounded. The five copies of each publication which plaintiffs consent that defendants shall keep seems fully sufficient.

8. Deputy Superintendent Giarrusso clearly pointed out that the law enforcement authorities were not pursuing "pornography", but, rather, were pursuing material of a borderline nature. He testified as follows:

"A. At this time, these men were told —they were shown several magazines, and the criteria that they were to use to determine whether the publications were obscene or not, in very simple language, was simply this—now, I am going to qualify what I am going to tell you —what was pornography or the displaying of the genital organs of the female or male sex; there is no question about that. *We were pursuing material that was of a borderline nature.* The criteria was the *secondary sex organs; by that, I mean the breasts of the female, the buttocks of the female, or the buttocks of the male for that matter.* That is very simply putting what the instructions were.

\* \* \* \* \* \* \*

"Q. Now, was it specifically your instructions to the men of your department who would make the arrests that

Books containing photographs of the paintings of Cranach, Rubens, and Botticelli would flunk this test flat. So would Gray's Anatomy, the Encyclopedia Brittannica, and the National Geographic Magazine. The standard is arbitrary, unreasonable, and in disregard of the criteria of obscenity as established in the courts.

It may well be, as plaintiffs argue, that the magazines seized are not "sexually indecent" within the meaning of the Louisiana Statute and that defendants' acts, therefore, were unauthorized under state law.[9] But, as we have already said, it is unnecessary to decide that question. It suffices that the criterion used by the police officers to judge obscenity, for purposes of seizure, does not meet federal constitutional due process requirements and that the application of that criterion by public officials of the state results in infringing plaintiffs' constitutionally protected rights. Such

a finding alone compels action by the court, irrespective of whether the publications seized are or are not obscene under state law. Iowa-Des Moines National Bank v. Bennett, 1931, 284 U.S. 239, 245-247, 52 S.Ct. 133, 76 L.Ed. 265; Home Telephone & Telegraph Co. v. City of Los Angeles, 1912, 227 U.S. 278, 33 S. Ct. 312, 57 L.Ed. 510.

■■ Obscenity is not protected under the First Amendment. But the Constitution does protect the free circulation and distribution of publications, no matter how objectionable to certain groups in the community unless "to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." It is not sufficient that an "isolated excerpt" is obscene or *even that the publication as a whole* might have a "deleterious effect upon youth," or any group of particular susceptibility.[10]

they were to look for bare breasts and/or bare buttocks?

"A. In addition to the other out-and-out pornography cases they might run across, yes, that's correct.

\* \* \* \* \* \* \*

"Q. Did any of these magazines taken from Oliver's Newsstand on December 22, 1959, *show indecent sex acts*?

"A. No, they didn't.

9. It may be that the seizure could be justified under LSA–R.S. 15:43 which purports to sanction the seizure of any obscene publication intended for circulation which "manifestly tends to corrupt the morals of youth." But defendants wisely disclaim reliance on this statute which announces a *standard clearly repugnant to the federal Constitution.* See Butler v. State of Michigan, 1957, 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed.2d 412; Roth v. United States, supra. The full text of the pertinent provision reads:

"Any judge may also, upon like complaint made on oath, issue a search warrant when satisfied that there is reasonable cause, in the following cases, to wit:

"(1) To search for and seize any books, pamphlets, ballads, codes, printed papers or other things containing obscene \* \* \* prints, pictures, figures or descriptions, manifestly tending to corrupt the morals of youth and intended to

be sold, loaned, circulated, or distributed, or to be introduced into any family, school or place of education; \* \* \* "

It should be noted that the statute does not merely condone confiscation of obscene publications intended to be distributed directly to minors, or even to be circulated in places where they are likely to see them, but permits seizure of such material held for sale or circulation to anyone, young or old. If the provision had been more carefully restricted to protect the young, a different question would be presented and a contrary result might be indicated.

10. In Roth the Supreme Court quoted with approval the following instructions of the trial judge to the jury [354 U.S. 476, 77 S.Ct. 1312]:

"The test is not whether it would arouse sexual desires or sexual impure thoughts in those comprising a particular segment of the community, the young, the immature or the highly prudish or would leave another segment, the scientific or highly educated or the so-called worldly-wise and sophisticated indifferent and unmoved.

\* \* \*

"The test in each case is the effect of the book, picture or publication considered as a whole, not upon any particular class, but upon all those whom, it is likely to reach. In other words, you determine its impact upon the aver--

Roth v. United States 1957, 354 U.S. 476, 488–89, 77 S.Ct. 1304, 1311, 1 L.Ed.2d 1498; Butler v. State of Michigan, 1957, 352 U.S. 380, 383, 77 S.Ct. 524, 525, 1 L.Ed.2d 412.

■ Here, the "rule of thumb" went far beyond permissible limits in labelling obscene the publications in suit. First of all, the defendants concededly were not looking for pornographic material. Defendants were after borderline material. According to their instructions, a magazine was over the line, not if the magazine as a whole was obscene but if it contained one objectionable picture. Second, the evidence shows that the law enforcement officers were primarily concerned with the effect of the publication on the young, rather than its effect on the average person. The concern of our officials for the morals of our youth is certainly commendable—we sincerely commend it— but as a matter of law, under the decisions, the crux of the obscenity question is the prurient appeal to the average, normal, adult person. Finally, the law seems clear that the mere depicting of the nude body does not necessarily "appeal to prurient interest". See Sunshine Book Co. v. Summerfield, 1958, 355 U.S. 372, 78 S.Ct. 365, 2 L.Ed.2d 352, reversing 101 U.S.App.D.C. 358, 249 F. 2d 114.[11]

Because of the defective test used by the seizing officials, the acts complained of were constitutionally objectionable. A test so irrational presents a serious danger of infringing rights protected by the Constitution. This conclusion alone requires an order directing the return of the materials seized and the issuance of a preliminary injunction restraining defendants from acting similarly in the future. The plaintiffs are entitled to continue their business of distributing magazines and periodicals, unless they distribute material judged obscene according to the criterion announced in Roth. Plaintiffs are clearly entitled to this much relief.

Neither our ruling here nor anything we have said should be construed as precluding an effective state policy of safeguarding minors against publications which, though not obscene when judged by the standards of the community as a whole, may, nevertheless, be thought to have a corrupting influence on the morals of youth.[12] While we have no occasion here to pass on the constitutionality of such a law, it would seem that a state might enact a valid statute "specifically designed to protect its children" from suggestive books and magazines that are not too rugged for grown men and women, without at the same time burning the house down to roast the pig by restricting everyone else to reading such fiction as Boy's Life at the magazine stand and The Five Little Peppers at the bookstand. See Butler v. State of Michigan, 1957,

age person in the community. The books, pictures and circulars must be judged as a whole, in their entire context, and you are not to consider detached or separate portions in reaching a conclusion. You judge the circulars, pictures and publications which have been put in evidence by present-day standards of the community. You may ask yourselves does it offend the common conscience of the community by present-day standards."

11. In the Sunshine case the Supreme Court ruled unanimously that Sunshine and Health and Sun Magazine were constitutionally protected although these magazines showed a large assortment of unretouched photographs of nudists.

The trial judge described the photographs as "filthy", "foul", and "obscene". 128 F.Supp. 564. See also Mounce v. United States, 1957, 355 U.S. 180, 78 S. Ct. 267, 2 L.Ed.2d 187 and LeBaron v. Olesen, D.C.1954, 125 F.Supp. 53, involving the nude photograph of a well known actress.

12. As already noted, the pertinent statutes here do not distinguish between sales to adults and sales to minors. Nor were the seizures predicated on the accusation that the allegedly offensive materials were intended for distribution to children. On the contrary, the record contains a disclaimer that such publications were ever sold to minors.

**248**

352 U.S. 383, 77 S.Ct. 524, 526, 1 L.Ed. 2d 412. This may take a little doing,[13] but other states follow such a course.[14] In other areas of the law Louisiana makes a distinction between what is proper for adults and not proper for children. Thus, Louisiana wisely prohibits the sale of intoxicating liquors to minors without depriving the rest of its citizens of the occasional drink that to some is one of the few remaining privileges incident to arriving at the age of majority.

Judgment accordingly.

---

13. Thus Plato in The Republic:

"Socrates. Then shall we carelessly and without more ado allow our children to hear any casual stories told by any casual persons, and to receive into their souls views of life for the most part at variance with those which we think they ought to hold when they come to man's estate?"

"Adeimantus. No we shall certainly not allow that."

"Socrates. Our first duty, then, it seems, is to set a watch over the makers of stories to select every beautiful story they make, and reject any that are not beautiful. Then we shall persuade nurses and mothers to tell those selected stories to the children. Thus will they shape their souls with stories far more than they can shape their bodies with their hands. But we shall have to throw away most of the stories they tell now." (Everyman Edition (1936), p. 58.)

14. See, e. g., the Michigan statute quoted with apparent approval in the Butler v. State of Michigan case, 352 U.S. at page 382, 77 S.Ct. at page 525.