[Cite as *State v. Pollock*, 2017-Ohio-91.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 104161**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## WALTER POLLOCK

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-597896-A

**BEFORE:** Jones, P.J., Boyle, J., and Laster Mays, J.

**RELEASED AND JOURNALIZED:** January 12, 2017

**ATTORNEY FOR APPELLANT**

Russell S. Bensing
1460 East 9th Street, Suite 600
Cleveland, Ohio 44114


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

BY: Edward D. Brydle
        Brett Hammond
Assistant County Prosecutors
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

LARRY A. JONES, SR., P.J.:

{¶1} Defendant-appellant Walter Pollock appeals his convictions on 27 felony counts of pandering obscenity, which were rendered after a jury trial. We affirm.

{¶2} Pollack was charged in August 2015 with 52 crimes related to three victims: L.T., P.A., and C.B. The victims, as well as Pollock, worked for the Defense Finance Accounting Service ("DFAS"), which was located in the federal building in downtown Cleveland. In addition to pandering obscenity, Pollock was also convicted on numerous counts of menacing by stalking, telecommunications harassment, and public indecency.[1] He was sentenced to six months in jail, two years of community control sanctions, and was labeled as a tier 1 sex offender.

**Trial Testimony**

**L. T.**

{¶3} L.T., a systems analyst for DFAS, never worked directly with Pollock. Rather, she became acquainted with him on her commute into work. Specifically, she would drive to a rapid station near her home, take the rapid to Tower City in downtown Cleveland, and walk from Tower City to the DFAS building. Pollock also rode the same rapid train as L.T. The two would not communicate on the train, but during her walk to work, L.T. would also see Pollock walking to work, and one day in the summer of 2011, the two started walking together and talking. L.T. testified that they mainly talked about

---

[1] Of the 52 indicted counts, two counts were dismissed pursuant to a Crim.R. 29 motion, and the jury acquitted Pollock on three counts.

church and the bible.   In the fall of 2011, Pollack started emailing L.T. daily devotionals and jokes to her work email address.

{¶4} In February 2012, Pollock's conversation with L.T. changed, however.   He told her that young girls at the mall aroused him.   L.T. changed the conversation, hoping that it was an anomaly, but Pollock went on to tell her that walking with her also made him feel aroused.   L.T. testified that she was frightened and confused.   She told Pollock that she did not intend to lead him on, she did not have romantic feelings for him, and the topic of conversation was uncomfortable.

{¶5} But Pollock continued with his behavior toward L.T., and in March 2012, he sent her an email informing her that he had erectile dysfunction and he was going to the doctor.   L.T. sent Pollock two emails, dated March 16, 2012 and April 2, 2012, telling him to stop talking to and emailing her.   She stopped responding to his emails and avoided him on the rapid and walk to work.

{¶6} Pollock, however, did not leave L.T. alone.   He started parking at the same rapid station lot as her, which he had previously not done.   In December 2012, he sent her a Christmas card to her home; L.T. testified that she had never given Pollock her home address and was not listed in the phone book.

{¶7} In December 2013, Pollock sent L.T. a nude photograph of himself with an email describing sex acts he wanted to do to her.   He sent another email with a nude photograph in April 2014.   Shocked and fearful, L.T. reported the emails.   Inspector Christopher Kiah ("Inspector Kiah") of the Department of Homeland Security's Federal

Protective Service was assigned to investigate, and placed a block on L.T.'s email to prevent more emails from Pollock.   Pollock continued to email her, however, using other email addresses.

**P. A.**

{¶8} P.A., who worked as an information technology specialist for DFAS, also did not work directly with Pollock; rather, her office was located close to Pollock's cubicle. She would engage in casual, brief conversations with him, usually about activities in the city and the weather.

{¶9} In November 2012, P.A. began receiving emails from Pollock.   At that time, he was no longer at DFAS because he had been fired.   In his first email, Pollock complained that he no longer had a job and did not know why.   P.A. did not reply, but she continued to get emails from Pollock, the topics of which were religion, inspiration, or his job search; she continued to ignore the emails and did not reply.

{¶10} In May 2014, P.A. began receiving inappropriate emails from Pollock as well; the emails contained nude pictures of Pollock.   P.A. reported the emails and was put in contact with Inspector Kiah. From that point, P.A. would forward any emails she received from Pollock to Inspector Kiah without opening the attachments.

**C. B.**

{¶11} C.B. worked as a technical team leader for the integrated garnishment system at DFAS, and on the same floor as Pollock, nearby where he worked.   She did not have regular daily contact with Pollock, but any issues she had with the application

she worked on had to be brought to Pollock's attention because he maintained the server that the application ran on. Pollock would send C.B. frequent emails relating to current events and work-related material.

{¶12} After he was fired from DFAS, Pollock eventually got a job at NASA. He then started sending nude emails of himself to C.B. C.B. told him to leave her alone, and immediately reported the situation. She was put in touch with Inspector Kiah and any future emails she received from Pollock she forwarded to Inspector Kiah.

**The Photographs**

{¶13} Inspector Kiah collected approximately 200 emails sent by Pollock to L.T., P.A., and C.B. The photos of Pollock, which were admitted into evidence, showed him in his home, his NASA cubicle, and public spaces, mostly the Cleveland Metroparks. The majority of the photos showed Pollock holding his penis and/or testicles with his hand or palm. Of those photos, one included what appeared to be semen and for one he described that he was "pumping." Five other photos showed Pollock ejaculating. And two other photos showed Pollock masturbating — one with an electric toothbrush and the other with him wearing a set of headphones with the jack "plugged into" his penis. Some of the subject lines and/or the text of the emails contained lewd language and/or sexual innuendo. All three women testified that they were disgusted, shocked, and even fearful of Pollock because of these incidents.

{¶14} On this evidence, the jury convicted Pollock of 27 felony counts of pandering obscenity, and numerous counts of menacing by stalking, telecommunications

harassment, and public indecency.  He now appeals, solely challenging the pandering

convictions in the following assignment of error:

> The trial court erred in entering a conviction for pandering obscenity, in derogation of defendant's rights to due process of law, as protected by the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Section 14 of the Ohio Constitution, because such conviction was supported by insufficient evidence.

**Law and Analysis**

{¶15} Pollock contends that the evidence was insufficient to support the pandering

obscenity because the subject images were not obscene.   For the reasons that follow, we

disagree.

{¶16} Sufficiency is a test of adequacy.   Whether the evidence is legally

sufficient to sustain a verdict is a question of law.    *State v. Thompkins*, 78 Ohio St.3d

380, 386, 678 N.E.2d 541 (1997).   When reviewing the sufficiency of the evidence to

support a criminal conviction, an appellate court examines the evidence admitted at trial

to determine whether such evidence, if believed, would convince the average mind of the

defendant's guilt beyond a reasonable doubt.   The relevant inquiry is whether, after

viewing the evidence in a light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶17} Further, because Pollock has raised a First Amendment challenge, we

> must conduct an independent review of the record * * * "to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be

inhibited."

*Urbana ex rel. Newlin v. Downing*, 43 Ohio St.3d 109, 115, 539 N.E.2d 140 (1989), quoting *Bose Corp. v. Consumers Union*, 466 U.S. 485, 505, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

{¶18} Pollock was convicted of pandering obscenity under R.C. 2907.32(A)(2), which provides as follows:

> No person, with knowledge of the character of the material or performance involved, shall * * * [p]romote or advertise for sale, delivery, or dissemination; sell, deliver, publicly disseminate, publicly display, exhibit, present, rent, or provide; or offer or agree to sell, deliver, publicly disseminate, publicly display, exhibit, present, rent, or provide, any obscene material.

{¶19} Obscenity is governed by R.C. 2907.01(F) as follows:

> (F)   When considered as a whole, and judged with reference to ordinary adults or, if it is designed for sexual deviates or other specially susceptible group, judged with reference to that group, any material or performance is "obscene" if any of the following apply:
>
> (1)   Its dominant appeal is to prurient interest;
>
> (2)   Its dominant tendency is to arouse lust by displaying or depicting sexual activity, masturbation, sexual excitement, or nudity in a way that tends to represent human beings as mere objects of sexual appetite;
>
> (3)   Its dominant tendency is to arouse lust by displaying or depicting bestiality or extreme or bizarre violence, cruelty, or brutality;
>
> (4)   Its dominant tendency is to appeal to scatological interest by displaying or depicting human bodily functions of elimination in a way that inspires disgust or revulsion in persons with ordinary sensibilities, without serving any genuine scientific, educational, sociological, moral, or artistic purpose;
>
> (5)   It contains a series of displays or descriptions of sexual activity,

masturbation, sexual excitement, nudity, bestiality, extreme or bizarre violence, cruelty, or brutality, or human bodily functions of elimination, the cumulative effect of which is a dominant tendency to appeal to prurient or scatological interest, when the appeal to such an interest is primarily for its own sake or for commercial exploitation, rather than primarily for a genuine scientific, educational, sociological, moral, or artistic purpose.

**{¶20}** However, Pollock contends that we are bound by the requirements for proof of obscenity set forth by the United States Supreme Court in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2697, 37 L.Ed.2d 419 (1973). The Supreme Court discussed the requirements as follows:

> We acknowledge * * * the inherent dangers of undertaking to regulate any form of expression. State statutes designed to regulate obscene materials must be carefully limited. As a result, we now confine the permissible scope of such regulation to works which depict or describe *sexual conduct. That conduct must be specifically defined by the applicable state law, as written or authoritatively construed.* A state offense must also be limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray *sexual conduct* in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value.

> The basic guidelines for the trier of fact must be: (a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, *sexual conduct specifically defined by the applicable state law*; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

(Emphasis added. Citations omitted.) *Id.* at 23-24.

**{¶21}** Pollock contends that the materials at issue here were not obscene because they do not meet the definition of "sexual conduct" which is defined under R.C. 2907.01(A) as follows:

> Vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege

to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

**{¶22}** The Ohio Supreme Court has addressed how R.C. 2907.01(A) and the *Miller* test interact in *Newlin*, 43 Ohio St.3d 115, 539 N.E.2d 140 (1989), and *State v. Burgun*, 56 Ohio St.2d 354, 384 N.E.2d 255 (1978). Specifically, the court directed that we must first examine whether the material depicts or describes sexual conduct, as defined by state law, in a patently offensive way. *Newlin* at *id.* Second, we must determine whether the average person, applying contemporary community standards, would find the material, taken as a whole, to appeal to the prurient interest. *Id.* Finally, we examine whether a reasonable person would find that the material, taken as a whole, lacks serious literary, artistic, political, or scientific value. *Id.* We consider each in turn.

**Whether the Photos Constituted Sexual Conduct in a Patently Offensive Manner**

**{¶23}** In *Newlin*, the Ohio Supreme Court noted that the *Miller* court gave the following two examples of what could constitute sexual conduct:

(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.

(b) Patently offensive representations or descriptions of masturbation, excretory functions and lewd exhibition of the genitals.

*Newlin* at 115-116, citing *Miller* at 25.

**{¶24}** Thus, in a prosecution for pandering obscenity, with the *Miller* test incorporated, the state must prove the following:

(a) The material depicts conduct which is sexual; that is, it depicts vaginal intercourse or any of the other explicit examples expressly set forth in the definition of sexual conduct in section 2907.01(A), *or any of the two examples of such conduct described in Miller*;

(b) the sexual conduct depicted is obscene, as that term is expressly defined in section 2907.01(F)(1)-(5); and

(c) the material meets the three guidelines of *Miller*, in that (1) when taken as a whole and applying contemporary community standards, it appeals to the prurient interests of the average person; (2) it depicts or describes, in a patently offensive way, the sexual conduct specifically defined in section 2907.01(A) or the examples of *Miller*; and (3) taken as a whole, it lacks serious literary, artistic, political, or scientific value.

(Emphasis added.) *Burgun* at 361.

{¶25} We agree with Pollock that the photos at issue here do not fall into the definition of "sexual conduct" under R.C. 2907.01(A). But, as the above demonstrates, the two examples mentioned in *Miller* also constitute sexual conduct.

{¶26} The second example could apply here; that is, that the photos Pollock sent to the three women depicted "representations or descriptions of masturbation, * * * and lewd exhibition of the genitals." But we have to consider whether they were "patently offensive." What is "patently offensive" is generally a question of fact. *Miller* at 30. Pollock contends that to be "patently offensive" the photos must have depicted "hard core" sexual conduct, which they did not. It has been held, however, that even if the depiction of the sexual conduct is of a "passive nature," as opposed to a "hard core nature" that "does not mean that these [materials] cannot be characterized as obscene under the proper factual circumstances." *State v. Brooks*, 21 Ohio App.3d 47, 51, 486 N.E.2d 135 (11th Dist. 1984).

**{¶27}** For example, it has been held that the "lewd display of the genitals in the state of sexual excitement or in the state of nudity could be considered obviously offensive to adults with ordinary sensibilities." *Columbus v. Shover*, 10th Dist. Franklin No. 78AP-58, 1978 Ohio App. LEXIS 10288, *8 (Dec. 28, 1978).

**{¶28}** We find this case to be a circumstance where the photos were obscene. The women testified that they were "shocked" and "disgusted" by them, and even before Pollock started sending the photos to the women, L.T. told him that she was uncomfortable with his conversations about sex and rebuked him. Further, the photos were sent in emails, either as attachments or in the body of the emails, and contained lewd language and/or sexual innuendo either in the subject lines or the texts of the emails. Moreover, all the emails were sent to the women's work emails at the federal government, a circumstance that makes the photos even more offensive.

**{¶29}** There therefore was sufficient evidence that the photos constituted sexual conduct in a patently offensive way.

**Whether the Average Person Applying Contemporary Community Standards Would Find the Photos, Taken as a Whole to Appeal to the Prurient Interest**

**{¶30}** For purposes of the *Miller* test, the average person is "one with average sex instincts." *Newlin* at 112, citing *Volanski v. United States*, 246 F.2d 842, 844 (6th Cir.1957). We are not free to impose our own personal standards regarding obscenity and, therefore, it is the role of the jury to "gauge the reaction of the community * * * as if the 'average person' viewed the material." *State v. Jenkins*, 1st Dist. Hamilton No. C-040111, 2004-Ohio-713, ¶ 46, citing *Newlin* at 113.

**{¶31}** In regard to "prurient interest," it has been held that a prurient interest is not the same as a candid, normal, or healthy interest in sex, rather it is a "'shameful or morbid interest in nudity, sex, or excretion [which] goes substantially beyond customary limits of candor in description or representation of such matters.'" *Newlin* at 116, citing *Roth v. United States*, 354 U.S. 476, 487, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), fn. 20.

**{¶32}** In reviewing the materials here as a whole, we find that there was sufficient evidence that the average person applying contemporary community standards would find the photos appealed to the prurient interest. In his commentary included with the photos, Pollock often made crude remarks, and referenced the risk he was taking of shooting himself nude at work and in the park.

**Whether a reasonable person would find that the photos, taken as a whole, lacked serious literary, artistic, political, or scientific value**

**{¶33}** Pollock does not contend that the photos had serious literary, artistic, political, or scientific value, and our review shows that they did not. There was sufficient evidence to support the finding that there was no value, as outlined above, in the photos.

**Obscene under R.C. 2907.01(F)(1)-(5)**

**{¶34}** Having found that subsection (a) as set forth in *Burgun*, 56 Ohio St.2d 354, 361, 384 N.E.2d 255 (1978) applies, that is that the photos depict conduct that is sexual, and that subsection (c) applies, that is that the photos meet the three guidelines set forth in *Miller*, we finally consider subsection (b): whether the sexual conduct depicted is obscene as set forth under R.C. 2907.01(F)(1)-(5). We find that subsections (1), (2), and (5)

apply. Those subsections provide that material is obscene if:

(1) Its dominant appeal is to prurient interest;

(2) Its dominant tendency is to arouse lust by displaying or depicting sexual activity, masturbation, sexual excitement, or nudity in a way that tends to represent human beings as mere objects of sexual appetite; [or]

* * *

(5) It contains a series of displays or descriptions of sexual activity, masturbation, sexual excitement, nudity, bestiality, extreme or bizarre violence, cruelty, or brutality, or human bodily functions of elimination, the cumulative effect of which is a dominant tendency to appeal to prurient or scatological interest, when the appeal to such an interest is primarily for its own sake or for commercial exploitation, rather than primarily for a genuine scientific, educational, sociological, moral, or artistic purpose.

{¶35} In light of the above, there was sufficient evidence to support the finding that the photos were obscene, both under *Miller* and R.C. 2907.05(F). The pandering obscencity convictions were therefore supported by sufficient evidence and Pollock's sole assignment of error is overruled.

{¶36} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of

the Rules of Appellate Procedure.


_____
LARRY A. JONES, SR., PRESIDING JUDGE

MARY J. BOYLE, J., and
ANITA LASTER MAYS, J., CONCUR